# SMITH *v.* REYNOLDS.

EQUITY PLEADING ; PUBLIC LANDS ; LAS VEGAS GRANT ; CONFIRMA-
TORY ACT OF CONGRESS ; ULTRA VIRES ACT OF LAND DEPART-
MENT ; INJUNCTION.

1. On demurrer to a bill in equity, all facts properly alleged are ad-
mitted, but not the legal conclusions drawn therefrom by the
pleader.   The legal construction of matters of fact alleged, and
also the construction of acts of Congress involved, and the offi-
cial acts of Government agents and officers thereunder, is for
the court.

2. Under the provisions of the Treaty of 1848 between the United
States and Mexico, by which what is now the Territory of New
Mexico was ceded to the former, the United States are bound
to observe and maintain the validity of grants made by Mexico
prior to the cession as Mexico would have maintained them.

3. The act of Congress of June 21, 1860 (12 Stat. 71), confirming the
report of the Surveyor General of New Mexico to the effect
that the Las Vegas grant was made in conformity with the
laws, usages, and customs of the Republic of Mexico, and that
the land embraced therein was lawfully separated from the
public domain and entirely beyond the disposal of the general
government, confirmed the entire grant as originally made
by the Republic of Mexico, and not merely such portions
thereof as had been allotted or assigned to settlers at the time
the Territory of New Mexico was ceded to the United States ;
and therefore no part of the land embraced within the limits
of such grant forms any part of the public domain of the
United States, and consequently the Land Department of the
Government has no jurisdiction over it.

4. And such being the case, injunction will lie to restrain the Land
Department of the Government from the execution of an order
for the resurvey of such grant so as to include therein only
lands allotted or assigned to settlers at the time the Territory
of New Mexico was ceded to the United States, the lands
within the boundaries of the grant not included in such survey
to be surveyed as public lands and opened to disposition under
the general land laws ; the proposed action being purely *ultra
vires.*

5. A confirmatory statute passes a title as effectually as if it in terms
contained a grant *de novo,* as a grant may be made by a law, as
well as by a patent, pursuant to law.

6. Where an act of Congress confirming a grant of lands is definite as to limitations of estate and extent of area, there is no power of review or control in any other department of the Government.

7. Where the head of a department is without power at all to do an act complained of, he is as much subject to injunction as he would be to mandamus in case of his refusal to do an act which the law plainly requires him to do.

No. 536. Submitted April 28, 1896. Decided September 30, 1896.

HEARING on an appeal by defendants from a decree in a suit for an injunction. *Affirmed.*

The facts are sufficiently stated in the opinion.

*Mr. John I. Hall,* Assistant Attorney General of the United States, and *Mr. Vivian Brent* for the appellants:

If the Secretary of the Interior had jurisdiction in the premises, and, in the exercise of his judgment and discretion, ordered the survey complained of, complainants are not entitled to the relief prayed. This rule is so well settled that it is not necessary to multiply authorities thereon. *Decatur* v. *Paulding,* 14 Peters, 497; *Gaines* v. *Thompson,* 7 Wall. 52; *Litchfield* v. *Richards,* 9 Wall. 575; *Marques* v. *Frisbie,* 101 U. S. 473; *U. S. ex rel.* v. *Black,* 128 U. S. 901.

Has the Secretary such jurisdiction? It is insisted he has not, because, 1st. The lands within said grant "never belonged to the United States and never constituted any part of the public domain, but belonged to the plaintiffs." 2d. Said grant was confirmed absolutely and unconditionally, by the act of June 21, 1860, to the town of Las Vegas, as an entirety, for all the lands within the original outboundaries of said claimed grant, and consequently the officers of the Land Department have only the ministerial duty to perform of ascertaining by surveys those outboundaries, when the absolute title of the confirmees to all the land within the same is irrevocably fixed and determined. 3d. This

ascertainment of the outboundaries was made by the survey of December 8, 1860, whereby all the lands contained therein became absolutely the property of the town of Las Vegas "by an indefeasible and unassailable right and title," and it is entitled to have and demand the undisturbed and peaceable enjoyment and ownership of the same. 4th. It is the duty of this court to protect the complainants in the full and undisturbed enjoyment of their right, title, and possession of the premises.

The correctness of each of these propositions is denied, and in reply thereto the appellants say:

1st. The lands being within the ceded territory, must be assumed to be public lands until otherwise shown in accordance with the requirements of law.

2d. The said grant was confirmed to the town of Las Vegas in trust only, and for the benefit of those who had acquired, in accordance with the terms of the original grant, any interest in any of the lands, within the limits of said outboundaries, at the date of the cession of the territory to the United States, and consequently the officers of the Land Department have the important executive duty to perform of ascertaining who had acquired such interest at that date, the extent and location of the same; which duty requires the exercise of the executive discretion and quasi-judicial judgment with which those officers are clothed under the law, and which will not be interfered with by the court. In any event, it is the duty of those officers to examine said confirmatory act and form their judgment as to its legal effect, taking such action as may seem to them appropriate. With the exercise of this judgment and action, so long as jurisdiction of the subject remains in the department, the courts will not interfere, and such jurisdiction continues until a patent has been issued for said lands. *Barden* v. *Railroad Co.*, 154 U. S. 326; *United States* v. *Schurz*, 102 U. S. 378.

3d. The Las Vegas grant, as confirmed by the act of

Congress, has never been surveyed; the alleged survey of 1860 was made only for the purpose of ascertaining the area within the described limits of the original grant, so as to enable the land officers to determine the acreage for which scrip should be issued to the Baca heirs. But even if this is not so, said alleged survey has never been approved by the Commissioner or Secretary, and is of no effect without such approval; it being competent for the Secretary at any time before the issue of patent to set aside the approval of the surveyor general and to order a new survey of a private land grant. *Cragin* v. *Powell,* 128 U. S. 691; *Knight* v. *Land Association,* 142 U. S. 176; *New Orleans* v. *Paine,* 147 U. S. 261; *Stoneroad* v. *Stoneroad,* 158 U. S. 248.

It has been uniformly held both by Congress and the courts that all Mexican grants were to be treated as inchoate claims and of no effect until confirmed by the United States authorities in the mode pointed out by its laws. See *Botiller* v. *Domingues,* 130 U. S. 338, and cases therein cited.

As to the claimed grants in California, Congress, by the act of March 3, 1851 (9 Stat. 651), directed that they should be submitted to a board of land commissioners, with the right of appeal therefrom to the courts. As to the lands in New Mexico, the same authority directed that such claim should be first submitted to the Surveyor General of New Mexico for report thereon to Congress, which reserved to itself the sole right of confirmation. Act of July 22, 1854 (10 Stat. 380).

It is too broad an assertion to say that lands within this grant were not public, or, conversely, were private property, because in contemplation of law and by its force and operation, notwithstanding the treaty, they were to be treated as and were public lands, unless otherwise determined in accordance with the provisions of our laws. The lands in question and all other lands similarly situated passed under the jurisdiction of our laws and the officers appointed

to administer them.   If at the proper time, and in the mode
pointed out, they were shown to have been previously
granted, the rights of the beneficiaries would be protected
under our laws.   But if this showing was not made to our
tribunals, and in accordance with the requirements of our
laws, the lands were treated and disposed of as the public
domain, and a prior grant thereof by the Mexican govern-
ment was of no more avail than if it had never been made.
*Botiller* v. *Domingues, supra ; Brown* v. *Brackett,* 21 Wall. 387.

Was said grant confirmed, absolutely and unconditionally,
for all the lands within the outboundaries to the town of
Las Vegas by the act of June 21, 1860 ?   Reading that
act, it fails utterly to throw any light on this question.   It
simply confirms claim No. 20 " as recommended " by the
surveyor general.   But as to what was confirmed, the char-
acter, nature and extent of the grant confirmed, we are com-
pelled, for an intelligent understanding, to have recourse to
the record in the case.   This being so, the land officers
whose duty it was to carry into effect the provisions of the
confirmatory act, were charged, not with the mere minis-
terial duty as stated by complainants, but were necessarily
compelled to construe the act of Congress and the record in
the case.

If the land officers have erred in their conclusions, that
error cannot now be corrected by the court by this proceed-
ing; but the errors of law may be corrected later on by the
courts, when the jurisdiction of the Interior Department
over the subject-matter has ceased.   Until then the courts
have no jurisdiction.   That will only be when the survey
has been made and approved by the proper land officers
and a patent issued thereon.

If the survey of 1860 is final, conclusive and absolutely
determinative of the rights of the complainants, and has
closed the door against executive action and ousted juris-
diction of the officers of the Land Department in the prem-
ises, then, it may be conceded, the injunction in this case

should be granted, prohibiting the Secretary from completing the survey.

The duties and obligations of the Land Department and of the Secretary of the Interior, are clearly defined by legislative enactments and the decisions of the Supreme Court. These Mexican grants are treated by Congress as inchoate rights—claims to be established like any other, in accordance with law; and, until established, all lands claimed to be covered by them are presumably public lands. In New Mexico it is specially provided that the surveyor general shall, on application of claimants, examine them and make · report thereon to Congress as to "the origin, nature, character and extent" of the same. See *Pinkerton* v. *Ledoux*, 121 U. S. 346. When such claims are confirmed they become known in the land office phraseology, as private land claims, and the jurisdiction of the Land Department continues over them until after approved survey and patent thereon.

Section 441, R. S., charges the Secretary of the Interior with the supervision of the public business relating to the "public lands." Section 453 provides that "The Commissioner of the General Land Office shall perform, under the direction of the Secretary of the Interior, all executive duties appertaining to the surveying and sale of the public lands of the United States, or in anywise respecting such public lands, and also such as relate to the private claims of lands and the issuing of patents for all grants of land under the authority of the Government." Under these laws there ought to be no doubt of the jurisdiction of the Secretary over the survey of private land claims. Such jurisdiction has been asserted ever since we have had a land system. Many cases could be cited to this effect, but just here reference is made to the case of the *Pueblo of San Francisco*, 5 L. D. 483, and afterwards affirmed by the Supreme Court in the case of *Knight* v. *United States Land Company*, 142 U. S. 177, as containing a full, clear and unanswerable exposi-

tion of the law in that behalf; and the case of *Stoneroad* v. *Stoneroad*, 158 U. S. 240–248.

The act of Congress or decree of a court or commission may confirm a grant, but a survey under the direction of the land officers alone can locate it and segregate it from the public lands. *Snyder* v. *Sickle*, 98 U. S. 203; *Stoneroad* v. *Stoneroad*, 158 U. S. 240. Revised Statutes, Section 2223, recognizes that all private land claims shall be surveyed after confirmation. And these surveys are entirely under the control and subject to the approval of the land officers, free from any control of the courts. *Cragin* v. *Powell*, 128 U. S. 691; *New Orleans* v. *Paine*, 147 U. S. 261; *Stoneroad* v. *Stoneroad*, 158 U. S. 240; *Maguire* v. *Tyler*, 1 Black, 195; *Knight* v. *Land Company*, 142 U. S. 177.

In this case the former survey has been rejected and a new one entered, and this court has no right to interfere. *Cragin* v. *Powell*, 128 U. S. 691; *New Orleans* v. *Paine*, 147 U. S. 261; *Stoneroad* v. *Stoneroad*, 158 U. S. 240. And the jurisdiction of the department must necessarily exist until patent. R. S., Sec. 2400.

*Mr. Alphonso Hart* and *Messrs. Long & Fort* for the appellees:

1. The history of the grant as given in the bill, all of which is admitted by the demurrer and also verified by documentary evidence, is itself an unanswerable argument in favor of its extent and validity. The Supreme Court of the United States has held (*Ryan* v. *Carter*, 93 U. S. 78) that an act of Congress unconditionally confirming a grant creates and vests a perfect title in the grantee. It is good as a patent or a deed.

The act of Congress in this case is the supreme law by which we are to be governed. The Secretary and Commissioner are required to obey it the same as other people. By it the rights of the occupants upon one hand and the Government upon the other are to be determined. When Con-

gress confirmed to the town of Las Vegas claim No. 20, it gave to Las Vegas an absolute and vested title to all the lands contained within these boundaries, whether it was one thousand or one million acres. The Secretary and Commissioner have no power to lessen or enlarge what Congress has done. They can neither make or unmake a grant. They must obey the law as they find it. It is not for them to question the wisdom of Congress. In the matter of confirming this grant the legislative authority was supreme. Congress had the undoubted right to confirm the grant to the town and people of Las Vegas and give the Baca heirs 496,446.96 acres of land elsewhere. When title to land has vested in a party, the United States has no control over it. *U. S.* v. *Schurz,* U. S. 102, 378. It has done it here and the title is fully vested.

2. The grant contains 496,446.96 acres. Mr. Secretary Noble, does not deny that a valid grant was made to the town of Las Vegas. He also admits that it contains 496,446.96 acres, but seems to insist that the title to only so much as had been actually cultivated by individuals prior to 1848 should be respected. We submit that if there was any grant at all to the people of Las Vegas it was for the entire amount, and not a small fraction of it. The grant confirmed by Congress is grant No. 20, which includes all that is shown by the survey to be contained in its exterior boundaries. It was a confirmation not of a part, but of the whole. The grant is an entirety, and must either be rejected as wholly invalid, or accepted as valid to its entire extent.

When Mr. Secretary Noble admitted that the Las Vegas grant was a valid one, as he does in his decision, it necessarily follows that it is valid to its entire extent. He cannot change the act of Congress and make a different grant from that which was confirmed. He cannot cut off one-quarter of it and say this quarter is the grant and the other

three-quarters are not. The law will not permit him to dismember it and thus in effect repeal an act of Congress. He is bound to obey the statute, and if he directly or indirectly seeks to set it aside and thus interfere with the legal rights of the inhabitants, he becomes a violator of the law, and of the rights of the plaintiffs. So when the present secretary attempts to execute and carry out the decision and order of his predecessor, he also violates the legal rights of the plaintiffs, and he cannot plead the illegal and unwarranted decision of his predecessor as an excuse.

3. These lands were never any part of the public domain. They were severed from the public lands of Mexico in 1835 by the authorities of that country when the grant was made and the parties placed in possession. Under the terms of the treaty with Mexico they remained private property as though no change of jurisdiction had taken place. By the report of the Surveyor General, acting under the law of 1854, they were declared to be no part of the public lands. This fact is recognized and asserted by the act of Congress. But even if they had not been severed from the public lands prior to 1860, the act of Congress being the highest authority upon this subject has made the severance and has placed them beyond the reach of the secretary and commissioner.

4. The action taken in 1860 is final. It is *res judicata.* The contention of counsel for the Government that the survey made in 1860 was never approved, but was suspended, and that another survey can be made at the pleasure of the Land Office, is not warranted by the facts. There was never any suspension of the survey. The further act of the Land Office in directing the selection and setting apart of an equal amount of land elsewhere to the Baca heirs and the issuing of patents therefor, which action was based entirely upon the survey of the Las Vegas grant, was a most formal and conclusive approval of what had been done. This action made it a finality and placed it beyond the

reach of disturbance in the future. Again, even if it were not so, the force of this point made by the learned counsel is destroyed by admitting, as they do, that the survey as then made was correct and that the area of the grant was accurately ascertained.

5. Two points are sought to be made as the basis of the secretary's decision, to wit: First, that the grant was not a grant of land in fee; second, that it was made not only to Maese and the twenty-five petitioners, but to others who were without lands, and was conditioned.

As to the first point, our answer is, that the Las Vegas grant was of the same kind and character as the great majority of other grants which were confirmed by Congress, and which have been held valid by the Supreme Court. It was the usual method of creating grants. It was, and is intended to be a grant in fee. Even if it was not a grant in fee, but merely an easement giving to the people the right to use the wood, water and pasture in common, the secretary has no authority to deprive them of it, or abridge the privilege in any manner. Congress has supreme authority. It was the sole judge of the title which had been granted. It decided in favor of and confirmed the grant to Las Vegas and its inhabitants. It could have done so whether the grant was in fee, or a mere easement, or no grant at all. In this case it unquestionably found a valid grant and confirmed it. *Tierra Amarilla Grant,* 19 L. D., p. 400.

As to the second point, that the grant was conditional, or a grant *in futuro,* a moment's reflection will show this position is not well taken. The only thing that can be claimed as a condition is that which provided that the grant was made not only to the petitioners, but to all who might be destitute of lands to cultivate, and that the pasture and watering places should be free to all. This condition has been fully complied with. Again, Congress was the sole judge of this condition or proviso, the same as in regard to all

other matters, and with full knowledge in the premises it confirmed the grant.

6. We are supported in our contention by a long line of authorities, a few of which are the following: *Tameling* v. *The United States Freehold Company*, 93 U. S. 644; *Maxwell Land Grant*, 121 U. S. 325; *Astiazaran* v. *Santa Rita Land Company*, 148 U. S. 80.

The present Secretary of the Interior has expressed no opinion as to the validity of this grant or the extent of its boundaries, but in two decisions upon precisely the same question he has decided in favor of the contention of the appellees in this case. *Mesita de Juan Lopez Case*, 16 L. D. 445; *Tierra Amarilla Case*, 19 L. D. 396.

7. This court, by writ of injunction, has power to restrain the defendants in their attempt to obtain possession of the lands in question. As to the right and duty of the court in a proper case to interpose by injunction, there can be no no doubt, and we think it equally clear that the present is a proper case for the exercise of this power. If public officers err in the construction of the law, parties are entitled to relief. *Marquez* v. *Frisbie*, 101 U. S. 473; *Moore* v. *Robins*, 96 U. S. 530; *Noble* v. *Union River Logging Co.*, 147 U. S. 165; *Board of Liquidation, &c.*, v. *McComb*, 92 U. S. 541.

There are many instances in which it is the right and duty of the judicial authority to intervene. Where the head of a department is acting in violation of law or the legal rights of parties, acting in that which is not a matter of discretion, then these parties injured may appeal to the courts for redress, and the courts will not fail to give it. *Noble* v. *Union River Logging Railroad Co.*, 147 U. S. 165.

Mr. Chief Justice ALVEY delivered the opinion of the Court:

The bill in this case was filed in the Supreme Court of the District of Columbia, on the 15th of February, 1895, by Jefferson Reynolds, for himself and the other inhabitants of

the town of Las Vegas in the Territory of New Mexico, and
of Las Vegas grant, and the town of Las Vegas, against
Hoke Smith, Secretary of the Department of the Interior,
and Silas W. Lamoreaux, Commissioner of the General Land
Office of the United States, to obtain an injunction to restrain
the defendants from directing the execution of an order for
the survey of Las Vegas grant, or from in any manner
treating the land included therein as part of the public do-
main.

The bill states the history of the grant from the Republic
of Mexico in 1835 to Juan Dios Maese, Miguel Archurletta,
Manual Duran and José Antonio Casaos, for themselves and
in the name of twenty-five men, for the cultivation of crops
and for pasture and watering places, etc., and which grant
was made with definite boundaries, and by subsequent sur-
vey, made under the authority of the United States, in 1860,
was ascertained to contain 496,446.96 acres of land.

The bill was demurred to by the defendants, and the de-
murrer having been overruled, and the defendants electing
to stand upon their demurrer, the court proceeded to declare
and decree that the defendants, as Secretary of the Depart-
ment of the Interior, and as Commissioner of the General
Land Office, respectively, had no jurisdiction over the lands
embraced in Las Vegas grant; and that the survey then in
progress, not being for the purpose of ascertaining the
amount of land contained in said grant, or determining its
boundaries, or for correcting any errors in the former sur-
vey, but for the purpose of taking from the grant a large
part of the lands contained therein, and subjecting it to the
control of the Land Department of the Government as part
of the public domain, they were, therefore, enjoined and
restrained from the further execution of the survey of the
grant, as being wholly unauthorized by law. It is from this
decree that the present appeal is taken, on the part of the
Government of the United States.

All facts properly alleged are admitted by the demurrer,

but not all the legal conclusions that the pleader may have drawn therefrom. The legal construction of the matters of fact alleged is exclusively for the court. And so the construction and effect of all acts of Congress involved is for the court and also the official acts of Government agents and officers acting thereunder.

It appears from the allegations of the bill that in 1821, the Mexican authorities granted to Luis Maria de Baca, and his seventeen male children, the tract of land that was subsequently granted to the parties named in the grant of Las Vegas. This original grant to Baca was described by the same boundaries that were named in the subsequent Las Vegas grant; and Baca entered into possession and was in the enjoyment of his grant when he was disturbed by hostile Indians, and was compelled to vacate his possession at great loss. After this grant to Luis Baca, the Mexican Congress, after an act of 1824, passed what has been known (and often recognized in our courts) as the colonization law, providing for the colonization of the territories of the Republic; and that, at the time of the passage of that law, New Mexico was a territory of the Republic, and so continued until December 30, 1836, when it became a department. By virtue of the act of 1824, a code of colonization was adopted in 1828, which contained regulations for the colonization of the territories of the Republic, whereby the political chiefs or governors of the territories were authorized to grant the public lands of their respective territories to contractors, families, or private persons, Mexicans or foreigners, who might apply for them, and were directed, when a grant was definitely made, to sign and give a document to serve as a title to the party in interest, it being stated therein that the grant was made in entire conformity with the provisions of the law, in virtue of which the possession should be given. *United States* v. *Chaves,* 159 U. S. 452, 458. It appears that it was by virtue of this coloniza-

tion act and the regulations made thereunder that the grant to Juan Dios Maese and others was made in March, 1835, with certain defined boundaries, and that the grantees were duly and formally placed in possession of the land granted, as required by law. It is alleged that the settlement thus established in 1835, has grown and increased until at the present time more than 3,000 families are located upon the grant, and that there is a population of about 20,000 inhabitants thereon ; and that these people are the original settlers or their descendants, and others who came upon the lands under the grant, and all hold under the terms thereof; and that they have made those lands their homes, and have cultivated them, and erected valuable improvements thereon.

No particular form of patent or grant appears to have been prescribed either by the Act of 1824 or the regulations of 1828, and no formal grants seem to have been required to convey and vest title under the Mexican law. *United States* v. *Larkin et al.*, 18 How. 558, 563. The chief objects of these grants, or cessions, as said by the Supreme Court in reference to the Mariposa grant of land in the Territory of California (*Freemont* v. *United States*, 17 How. 561), " was to colonize and settle the vacant lands. The grants were usually made for that purpose, without any other consideration, and without any claim of the grantee on the bounty or justice of the government. But the public had no interest in forfeiting them even in these cases, unless some other person desired, and was ready to occupy them, and thus carry out the policy of extending its settlements." The grant of Las Vegas, made in 1835, was found by the surveyor general of New Mexico, in 1858, and subsequently by Congress, in 1860, to have been in all respects regular and formal, according to the laws and customs of Mexico at the time the grant was made. And such being the case, we must assume that, if the Territory of New Mexico had not been ceded to the United States by the treaty of 1848, the

Republic of Mexico would have observed and maintained the validity of the grant to Maese and others in good faith. The United States have assumed the obligation, by treaty stipulation, to observe and maintain the validity of the grant in good faith, as Mexico would have maintained it.

By article 8 of the treaty of Guadalupe Hidalgo between the United States and the Republic of Mexico, made in 1848, it was expressly stipulated that Mexicans then established in territories ceded by Mexico to the United States, as defined by the treaty, should be free to continue where they then resided, or to remove at any time to the Mexican Republic, retaining the property which they possessed in the said territories, etc.; and those who should prefer to remain in the said territories might either retain the title and rights of Mexican citizens or acquire those of citizens of the United States, etc. And in the said territories, property of every kind, then belonging to Mexicans not established there, should be inviolably respected. The then owners, and their heirs, and all Mexicans who might thereafter acquire property by contract, should enjoy with respect to its guarantees equally ample as if the same belonged to citizens of the United States. And by article 9 it is further provided that, pending the admission of such territories into the union of the United States, Mexicans who reside therein shall be maintained and protected in the free enjoyment of their liberty and property, and secured in the free exercise of their religion without restriction. These stipulations are strictly in accordance with the well settled principles of the modern law of nations.

In the act of Congress of July 22, 1854, passed to organize a land office in the Territory of New Mexico, and also one for the Territories of Kansas and Nebraska, and providing for the appointment of surveyors general in said Territories, by the eighth section thereof, it is provided that—

"It shall be the duty of the surveyor general, under such instructions as may be given by the Secretary of the Inte-

rior, to ascertain the origin, nature, character, and extent of all claims to lands under the laws, usages and customs of Spain and Mexico; and, for this purpose, may issue notices, summon witnesses, administer oaths, and do and perform all other necessary acts in the premises. He shall make a full report on all such claims as originated before the cession of the territory to the United States by the treaty of Guadalupe Hidalgo of 1848, denoting the various grades of title, with his decision as to the validity or invalidity of each of the same, under the laws, usages and customs of the country before its cession to the United States; and shall also make a report in regard to all pueblos existing in the territory, showing the extent and locality of each, stating 'the number of inhabitants in the said pueblos, respectively, and the nature of their titles to the land; such report to be made according to the form which may be prescribed by the Secretary of the Interior; which report shall be laid before Congress for such action thereon as may be deemed just and proper, with a view to confirm *bona fide* grants, and give full effect to the treaty of 1848, between the United States and Mexico."

The surveyor general of New Mexico, acting under the provisions of this act of Congress of 1854, was fully instructed by the Commissioner of the General Land Office, with the approval of the Secretary of the Interior, as to the manner of his proceeding. He was required to investigate fully all titles to claims made, and in his report, to state clearly and distinctly such as were *bona fide* and should be confirmed, and such as were fraudulent and destitute of merit, and he was required to give his opinion as to the validity of each title, and present a map of the survey of such grants as he should deem valid. He was further instructed to deal with private land titles precisely as Mexico would have done had the sovereignty not changed, and to recognize all titles as she would have done.

It appears that the surveyor general, upon claim made to him, both in behalf of the town of Las Vegas and of the

heirs of Luis Baca, claiming adversely, and after full investigation of the titles founded upon the two grants for the same land (together with many other land claims presented and examined) made report to the General Land Office in 1858, as to the state and condition of those titles and claims. And in view of the terms of the confirmatory act of Congress passed thereon, hereafter to be more particularly referred to, it is proper to make a somewhat extended reference to the findings of the surveyor general in respect to the claim of the town of Las Vegas and its inhabitants, and that of the Baca heirs.

In his report, the surveyor general first examined the facts connected with the Baca grant, and he made full statement of those facts. He stated both the origin of the grant, and the boundaries of it; and he conceded that the land claimed was the same as that covered by the subsequent grant for Las Vegas.

In his report he then stated the origin of the grant made to Maese and others in 1835 for Las Vegas, and the facts under which it was made, and the exterior boundaries thereof; and that the grant was made by the territorial deputation with the boundaries asked for, with the further provision that persons who owned no lands were to be allowed the same privileges of settling upon the grant as those who petitioned for it; and that the petitioners were duly placed in possession by the proper authority. The report then proceeds:

" But, supposing the grant made to Baca by the deputation of Durango to be null and void, its confirmation by the territorial deputation of New Mexico in 1825, at which period it is not denied it had the power to grant lands, would be equivalent to a new grant; and, as it is complete in itself so far *as the severance of the land granted is concerned, to separate it from the public domain,* it is a matter of very little importance whether the former grant by the deputation of Durango was

valid or not. This grant is therefore deemed to be a good and valid one.

"The grant made to Juan de Dios Maese and others is not contested on the ground of any want of formality in the proceedings, but, as far as the documentary evidence shows, is made in strict conformity with the laws and usages of the country at the time."

The surveyor general then goes on to say:

"It is firmly believed that the land embraced in either of the two grants *is lawfully separated from the public domain and entirely beyond the disposal of the general government, and that in the absence of the one the other would be a good and valid grant*; but as this office has no power to decide *between conflicting parties*, they are referred to the proper tribunals of the country for the adjudication of their respective claims, and the case is hereby respectfully referred to Congress through the proper channel for its action in the premises."

This report was duly submitted to Congress, as it was required to be by the act of Congress of the 22d of July, 1854; and, in the Senate, it was referred to and considered by the Committee on Private Land Claims; and by that committee reported upon on the 19th of May, 1860. In the report of the committee, made by Senator Benjamin, it is said, in reference to Las Vegas grant, being No. 20 in the report:

"Amongst the claims embraced, however, in the second report and recommended for confirmation are two which cover the same tract of land and are embraced in one number, to wit, No. 20.

"To this tract the two claimants are, first, the heirs of Luis Maria Baca, who claim under a grant made by the provincial deputation of Durango to said Baca and his seventeen male children on May 29, 1821, which grant was ratified and confirmed on the — February, 1825, by the departmental assembly of New Mexico. This grant was in fee, and is a genuine and valid title; and, second, the town of Las Vegas. This town claims under a grant made on the

25th March, 1835, to Juan de Dios Maese and twenty-seven others by the territorial deputation on a petition which represented the land to be *public land,* and the petitioners were put in possession. The land has been divided out, and several hundred families are located on it.

" The surveyor general, having none but ministerial duties to perform, has recommended the confirmation of both these titles, leaving to the respective claimants the right of adjusting their conflicting claims in the courts; but Congress has other duties imposed on it, and is bound to legislate in such manner as to prevent, if possible, so disastrous a result as the plunging of an entire settlement of families into litigation, at the imminent hazard of being turned out of their homes or made to purchase a second time from a private owner of lands for which they paid their government a full equivalent in the labor, risk, and exposure by which they have converted a wilderness, surrounded by hostile savages, into a civilized and thriving settlement, and this can be done with little loss or cost to the government.

" The claimants under the title to Baca, also represented by Judge Watts as their counsel, have expressed a willingness to waive their older title in favor of the settlers if allowed to enter an equivalent quantity of land elsewhere within the Territory, and your committee cannot doubt that Congress will cheerfully accept the proposal, which, indeed, would undoubtedly have been acceded to by Mexico if the Territory had remained hers, and to whose rights and duties the United States have succeeded.

" The committee have therefore prepared an amendment to the House bill, by way of substitute, embracing the several provisions above referred to."

The act referred to and accompanying this report of the committee, was passed and became a law on June 21, 1860. By Section 3 of this act, it is provided, " That the private land claims in the Territory of New Mexico, *as recommended for confirmation by said surveyor general* in his report and

abstract marked Exhibit A, as communicated to Congress by the Secretary of the Interior, etc., and numbered from twenty to thirty-eight, *both inclusive, be, and the same are hereby, confirmed,* with the exception of the claim numbered twenty-six," etc. And by Section 4, it was enacted, " That the foregoing confirmation shall only be construed as quitclaims or relinquishments, on the part of the United States, and shall not affect the adverse rights of any other person or persons whomsoever." And by Section 6 of the act, it was provided, " That it shall be lawful for the heirs of Luis Maria Baca, who make claim to said tract of land as is claimed by the town of Las Vegas, to select instead of the land claimed by them an equal quantity of vacant land, not mineral, in the Territory of New Mexico, to be located by them in square bodies, not exceeding five in number. And it shall be the duty of the Surveyor General of New Mexico, to make survey and location of the lands so selected by said heirs of Baca when thereunto required by them. *Provided, however,* That the right hereby granted to said heirs of Baca shall continue in force during three years from the passage of this act and no longer."

It is alleged, and conceded to be the fact, that the Baca heirs made their election under the foregoing provision of the statute, to take other lands within the time prescribed, and that such other lands were duly located and assigned to them, as directed by the act of confirmation. The town of Las Vegas, and the people settled within the limits of the grant of Las Vegas, as made to Maese and others in 1835, were thus left in the free and undisturbed possession of the land granted to them, and of their homes, with all the rights and privileges professed to be conveyed by the grant. In fact, there has been no disturbance of their possession under the grant, until the recent action of the Land Department hereafter referred to.

In order to effectuate the exchange with the Baca heirs, and thus to extinguish their claim upon the grant of Las

Vegas, it was necessary that there should be a survey made of Las Vegas to ascertain the exact number of acres covered by the grant and embraced within the exterior boundaries designated. This survey was made under the direction of the General Land Office in 1860. In the letter of instruction by the Commissioner of the General Land Office to the Surveyor General of New Mexico, dated July 26, 1860, the Commissioner said: "You will proceed to have the exteriors of the Las Vegas town claim properly run and connected with the line of the public surveys. The exact area of the Las Vegas town tract having been thus ascertained, the right will accrue to the Baca claimants to locate a quantity equal to the area of the town tract elsewhere in New Mexico as vacant land, not mineral, in square bodies not exceeding five in number."

This survey was accordingly made, and the exchange effectuated, and the area of Las Vegas was ascertained to be 496,446.96 acres. A complete plat of this grant, showing a full table of the courses and distances of the outlines of the grant, as ascertained by the survey, is exhibited with the bill. The survey thus made was fully approved and acted on by the Land Department of the Government, and is of record in the General Land Office of the United States.

Now, the question is, what legal effect and operation had the treaty stipulation to which we have referred; the act of Congress of July 22, 1854; the finding and report of the surveyor general under that act; the confirmatory act of Congress of June 21, 1860, and the extinguishment of the claim of the Baca heirs in the land covered by the grant to the town of Las Vegas, upon the claim made under this latter grant? Do not these acts of the Government of the United States, when taken together, manifest a clear design and purpose to quiet the possession and settle the title in the town of Las Vegas and its settlers and occupiers of the land, to the full extent of the original grant as made by the authority of the Republic of Mexico, and not simply to the

extent only of such parcels of the land as may have been actually allotted and occupied prior to the date of the treaty of Guadalupe Hidalgo? There is nothing whatever that indicates a purpose on the part of the Government to confirm the grant only to a limited or partial extent. On the contrary, every act of the Government, both in its legislative and executive branches, repels the idea of a partial or limited confirmation; and it was not until very recently that the Land Department attempted to act upon a new theory as to the effect and operation of the grant, and the extent of the confirmatory act of Congress of 1860.

In 1891, the Secretary of the Interior, Mr. Secretary Noble, in an official letter to the Commissioner of the General Land Office, in regard to the Las Vegas grant, after referring to the acts of Congress, proceeded to discuss the question of the construction of the grant, and the effect of the acts of Congress; and he concluded that the Las Vegas grant was not a grant in fee to the applicants therefor or to the town of Las Vegas within the described boundaries, but a *concession of separate tracts* to settlers and occupants, and that the act of June 21, 1860, confirmed the title to lands *thus assigned and occupied* within the prescribed boundaries of the original grant, whether within the town of Las Vegas or outside of the same. And that a resurvey of this grant should be made *so as to include only the lands allotted or assigned to settlers under the terms of the original concession* at the time the territory of New Mexico became subject to the laws of the United States, and a patent should issue on such survey to the town of Las Vegas for the benefit of the proper parties, *having thus shown themselves entitled*; and further, that the lands not included in such survey of actually allotted and assigned lands within the boundaries of the grant, *should be surveyed as public lands and opened to disposition under the general land laws.*

This construction of Secretary Noble, while not in terms concurred in by the present Secretary of the Interior De-

partment, the latter does not appear to dissent therefrom; and it is alleged in the bill that the Commissioner of the General Land Office, with the approval and by the direction of the Secretary of the Interior, has directed and ordered the surveyor general of New Mexico to proceed at once to carry out the orders of Secretary Noble, by making a survey of the lands assigned to individuals prior to 1848, so that a patent may be issued to the town of Las Vegas for these several small tracts of land, and *that all the rest and residue of the lands contained in the grant be turned back as a part of the public lands* of the United States. It is to restrain this proceeding that the present application is made for an injunction.

In the construction of the grant of Las Vegas, and of the confirmatory act of Congress, declared by Mr. Secretary Noble, we cannot concur. As we have seen, by the act of 1854, the Surveyor General of New Mexico was required to ascertain the origin, nature, character and extent of all claims to lands under the laws, usages and customs of Spain and Mexico, and to report his decision as to the validity or invalidity of each of said claims, *for the final action of Congress.* In his report he finds and states that the grant of Las Vegas was made in strict conformity with the laws and usages of the country at the time; and that the land embraced in the grant was lawfully separated from the public domain, and entirely beyond the disposal of the General Government of the United States. The authority conferred upon the Surveyor General of New Mexico, by the eighth section of the act of Congress of 1854, was of a special *quasi*-judicial character, and his findings and conclusions are entitled to every presumption in their favor until overcome by contrary proof. The claim as reported was confirmed by Congress, and the very object of making provision for the Baca heirs, and thus extinguishing their prior claim to the land embraced in the grant of Las Vegas, was to give full effect and operation to this latter grant. The grant of Las

Vegas was confirmed in its entirety, and no part of the land was intended to be reduced to or made subject to the general regulations for the disposal of the public domain. All this was within the exclusive control and disposing power . of Congress; and the courts have no power to review the action of Congress in the premises. It is the settled doctrine of the Supreme Court of the United States that a confirmatory statute passes a title as effectually as if it in terms contained a grant *de novo*, and that a grant may be made by a law as well as by a patent, pursuant to law. *Ryan* v. *Carter*, 93 U. S. 78. And this was expressly held by the Supreme Court in respect to the confirmatory act of June 21, 1860, the act that confirmed the grant of Las Vegas. *Tameling* v. *U. S. Freehold, etc., Co.*, 93 U. S. 644, 661.

In this last mentioned case, the point decided was, that the action of Congress confirming a private land claim in New Mexico, as recommended for confirmation by the surveyor general of that Territory, acting under the act of 1854, is not subject to judicial review. In the opinion of the court it is said: "The determination of this case depends upon the effect of the act of Congress ' to confirm certain private land claims in the Territory of New Mexico,' approved June 21, 1860 (12 Stat. 71). Did the act confirm the Sangree de Cristo grant to the extent of the exterior boundaries of the claim ? If it did, the judgment below must be affirmed. If it did not, inasmuch as no specific portion of the land within those boundaries was severed from the remainder and confirmed to the claimant, the plaintiff below, who derives title under him, has not shown a right to the demanded premises, and the judgment must be reversed.

" We have repeatedly held that individual rights of property in the territory acquired by the United States from Mexico were not affected by the change of sovereignty and jurisdiction. They were entitled to protection whether the party had the full and absolute ownership of the land, or

merely an equitable . interest therein which required some
further act of the Government to vest in him a perfect title.
The duty of providing the mode of securing them and ful-
filing the obligations which the treaty of cession imposed,
was within the appropriate province of the political depart-
ment of the Government." And further on in the opinion,
the court say : " No jurisdiction over such claims in New
Mexico was conferred upon the courts; but the surveyor
general, in the exercise of the authority with which he was
invested, decides them in the first instance. The final ac-
tion on each claim reserved to Congress is, of course, con-
clusive, and therefore not subject to review in this or any
other forum. 'Congress acted upon the claim 'as recom-
mended for confirmation by the surveyor general.' The
confirmation being absolute and unconditional without any
limitation as to quantity, we must regard it as effectual and
operative for the entire tract."

In other words, where Congress has acted in plain and
unambiguous terms, and its action is definite, as to limita-
tions of estate and extent of area, there is no power of re-
view or control in any other department of the Government.
What Congress has declared must be accepted as conclusive,
in all matters relating to the disposition of the public lands,
whether it be in the form of confirmation of previous grants,
or the granting of land in exchange for the surrender and
relinquishment of prior titles, to make good a junior or sub-
ordinate grant. Where Congress has acted in either con-
firming or rejecting a land claim all other jurisdictions are
excluded, except where other jurisdiction is expressly con-
ferred. This principle is shown in the act of 1891, Ch. 529,
entitled "An act to establish a court of private land claims,
and to provide for the settlement of private land claims in
certain States and Territories." By Section 13 of that act
it is declared that " no claim shall be allowed for any land
the right to which has hitherto been lawfully acted upon
and decided by Congress, or under its authority."

The comparatively recent case of the *Maxwell Land Grant*, 121 U. S. 325, would seem to be quite controlling in this case. That was a case arising under the confirmatory act of Congress of June 21, 1860—the act of confirmation under which the present claim is founded. In that case, it was held that the grant to the full extent of the boundaries as described in the petition of the claimants was fully confirmed by the act. The court, in deciding that case, followed the previous case of *Tameling* v. *U. S. Freehold Co., supra*; and, in the course of the opinion, in discussing the effect of the surveyor general's report under the act of 1854, and of the confirmatory act of Congress of 1860, it was said :

" But as his office was a surveying office, and was designed to ascertain the location and the extent of grants by an examination of the maps and surveys, and making new surveys if necessary, a function pre-eminently appurtenant to his office, he must be supposed to have reported upon all that was proper for consideration in its confirmation. And when the Congress of the United States, after a full investigation and elaborate reports by its committees, confirmed these grants ' as recommended for confirmation by the surveyor general of the Territory,' we must suppose that it was intended to be a full and complete confirmation as regards the legal validity, fairness, and honesty of the grant, as well as its extent. This is made the more emphatic by the two or three cases in which the extent and location of the grant are specially limited in the very act of confirmation included in the same section and the same sentence."

It follows from what we have said, and the authorities cited, that we are of opinion that the act of confirmation of 1860 was effective and extended to the entire limits of the grant to the town of Las Vegas and others as originally made by the authorities of the Republic of Mexico, and that no part of the land embraced within the limits of such grant forms any part of the public domain of the United

States, and consequently the Land Department of the Government has no jurisdiction over it. Whether there remains in Congress a power to apportion or assign the lands within the grant among the settlers, according to the terms of the grant, is a question not presented or decided on this appeal. And clearly there is no occasion or necessity for a survey of the land included in the grant, in order to separate or distinguish it from the public lands of the Government, since that was effectually done by the survey of 1860, made under the direction and with the full approval of the Land Department.

Having thus concluded with respect to the right of the complainants, there would seem to be no question of the power and jurisdiction of the courts to restrain those acting or attempting to act for and in behalf of the Land Department of the Government from doing anything that would lessen the quantity or detract from the value of the land granted, or that would obstruct in any manner the full enjoyment thereof, in the manner and to the extent contemplated by the confirmatory act of Congress of 1860. The proposed action on the part of the Land Department is purely *ultra vires.* There is no official judgment or discretion required to be exercised by those representing the Land Department, and no fact required to be investigated and determined by them, with respect to the rights of the complainants. In such case it has been repeatedly held that an injunction may issue. If the head of a department has no power at all to do the act complained of, he is as much subject to an injunction as he would be to a mandamus if he refused to do an act which the law plainly required him to do. *Noble* v. *Logging Railroad Co.,* 147 U. S. 172, and cases there cited. In one class of cases referred to by the court in the case just mentioned, it has been held, that if land attempted to be patented had been reserved, or was at the time no part of the public domain, the Land Department would have no jurisdiction over it, and no power or authority to dispose of

it, and consequently the patent issued would be simply void. And in the recent case of *Burfenning* v. *Chicago, St. Paul, etc., R. Co.*, 163 U. S. 321, it is laid down as settled by many previous decisions that while in the administration of the public land system questions of fact are for the consideration and judgment of the Land Department, and its judgment thereon is final, yet when, by an act of Congress, a tract of land has been reserved from homestead and preemption, or dedicated to any special purpose, proceedings in the Land Department in defiance of such reservation or dedication, although culminating in a patent, will confer no title. In other words, as said by the court, "the action of the Land Department cannot override the expressed will of Congress, or convey away lands in disregard or defiance thereof."

In our opinion, the allegations of the bill present a clear case for remedy by injunction, and the court below committed no error in overruling the demurrer and passing the decree from which this appeal is taken. We shall therefore affirm the decree; and it is so ordered. The decree of affirmance will be entered as of June 13, 1896.

*Decree affirmed.*

An appeal was taken to the Supreme Court of the United States; and that court, on March 14, 1897, reversed the decree of the Court of Appeals and remanded the cause, with directions to reverse the decree of the court below and remand the cause to that court with directions to dismiss the bill for want of necessary parties.