Mr. Chief Justice Alvey
delivered the opinion of the Court:
The bill in this case was filed in the Supreme Court of the District of Columbia, by Pablo Maese, Jose L. Lopez, Dionicio Gonzales, and Jesus Maria Tafoza, against Binger Hermann, Commissioner of the General Laud Office of the United States, and Ethan Allen Hitchcock, Secretary of the Department of the Interior of the United States, in their respective official capacities, for the purpose of obtaining an injunction to restrain the defendants from issuing a patent for the laud embraced in the Mexican land grant, known as *54 the Las Vegas grant, to the town of Las Vegas, situate and located in the Territory of New Mexico, and for a decree directing said defendants to issue a patent for said lands, the extent or quantity thereof being 496,466.96 acres, to the grantees named in the grant, their heirs, legal representatives and assigns, in their own right and as their own absolute property.
The complainants allege in their bill that they are citizens of San Miguel County, in the Territory of New Mexico, and reside on what is known as the Las Vegas land grant, situated in that county, and that they bring this suit in their own right as heirs of the original grantees of said grant, and on behalf of all the other heirs and assigns of the original grantees of said grant who now have any interest therein and who have a common interest with the complainants, and who will bear their pro rata shares of the cost of this suit. They further allege that all the heirs and assigns of the original grantees in and to said grant are too numerous to be made parties by name.
Before proceeding to state the particular allegations of the present bill, it may be proper to state that a bill in equity asking an injunction against a former Secretary of the Interior Department and the then Commissioner of the General Land Office, to restrain those officials from an attempted or threatened action .with respect to the lands embraced in the Las Vegas grant, has been before this court on a former occasion for consideration. That was a bill filed by Jefferson Reynolds for himself and the other inhabitants of the town of Las Vegas, and of the Las Vegas grant, and by the town of Las Vegas, against the Hon. Hoke Smith, Secretary of the Interior Department, and the Commissioner of the General Land Office, praying an injunction to restrain the execution of an order for the survey of the land embraced in the Las Vegas grant, or from in any manner treating the land included therein as part of the public domain. On demurrer to the bill, the court below held the parties *55 entitled, to the relief prayed, and granted the injunction; and this court, on appeal, affirmed the decree. Smith v. Reynolds, 9 App. D.C. 261. And from that decree of affirmance an appeal was taken to the Supreme Court of the United States, but before the case could be disposed of on its merits in that court, Secretary Smith retired from office; and under the law as it then stood (but since changed,) the court, following the authority of the preceding case of Warner Valley Stock Co. v. Smith, 165 U. S. 28, held that the case abated, and that the bill should be dismissed for want of proper parties. Smith, Secretary, etc., v. Reynolds, 166 U. S. 717.
We refer to that case more particularly as containing the facts and history of the grant of Las Vegas, the conflicting claims made in respect thereof under the treaty between the United States and the Republic of Mexico, and the proceedings in regard thereto under the act of Congress-of July 22, 1854, and the subsequent confirmation of the claim of the town of Las Vegas, by the act of Congress of June 21,1860.
The present bill proceeds upon the theory and claim that the grant of Las Vegas was of a purely private nature ; that the grant was to certain individuals, and the right to the land became vested in them as their individual property, exclusive of all communal rights; and that the heirs, descendants, representatives and assigns of the original grantees are entitled to a patent for the land, notwithstanding the claim by, and the confirmation of that claim to, the town of Las Vegas, by the act of Congress of June, 1860.
The complainants, by their bill, allege that, by the law, it is made the duty of the Commissioner of the General Land Office to issue a patent to the grantees of all private land grants which have been confirmed by Congress, and that said Commissioner is, under the law, required to issue patents for all such confirmed private land grants to the grantees named in the original grant, their heirs or assigns, and in the discharge of his duty therein he has no judicial or *56 discretionary power, but acts ministerially alone in the issuing of such patents. It is then alleged that, by the confirmatory act of Congress, the Las Vegas grant was declared to be valid, and that the Government of the. United States had acquired no right or title to the lauds.therein embraced, and that the land department of the Government had no such jurisdiction over the same as would authorize the officials of that department to adjudicate or determine the question as to whom a patent should of right issue for said land embraced in the grant.
The complainants further allege, that all the original grantees named and designated in the grant have died, and that they each and all died seised and possessed in common of said lands, except possibly in some instances some of the original grantees had purchased the right, title and interest of some of their co-grantees in said laúd; and they further aver and charge that they and those whom they represent herein are all either heirs of the original.grante.es, or hold title to said lands by conveyances, mediate or immediate, from original grantees of said lands, and that, as heirs and assigns of the original grantees, they are the true and real owners in fee absolute of all of said lands, and as such are- entitled to have a patent issued to them, for all of said lands.
It is then alleged, that, on December 17, 1898, upon a petition filed in the Interior Department of the United States, praying that a patent be ordered to be issued to the town of Las Vegas for all the land included in said Las Vegas grant, the Hon. Thomas .Ryan, the then acting Secretary of the Interior Department, addressed a letter to the Commissioner of the General Land Office, whereby said Interior Department ordered and directed the Commissioner of the General Land Office to issue a patent for said lands to the town of Las Vegas, which order still remains and continues in full force and effect.
Said complainants further allege, that they are informed and believe, and so charge as a fact, that at the date of the *57 making of the said Las Vegas grant by the Mexican officials, there was no place of collection of people having any legal existence, under the laws, customs, or usages of the Republic of Mexico, or of the Territory of New Mexico, known or designated as the town of Las Vegas, nor was there any town by name of Las Vegas on said grant, or elsewhere, at that time, which, under the laws in force at that time in the Territory of New Mexico had any legal or corporate existence, or which, under or by virtue of any law, custom, or usage, in force in New Mexico, could take or acquire title to lands. And they further allege and charge that said land grant was not made to any town by name of Las Vegas, or by any other name; that the town of Las Vegas did not, nor did any other town ever petition the Surveyor-General of New Mexico to investigate the nature, character, extent, or validity of said grant, and that the only petition ever preferred to anj surveyor-general for such an investigation touching said grant was preferred by individuals representing the original grantees, Maese and others, their heirs and assigns. That said surveyor-general reported that said grant was made in due form to said Maese and his associates, and was to them a valid grant; and that said grant was duly and legally confirmed by Congress to the original grantees, and that it was not confirmed to a town by the name of Las Vegas, or to any other town. That complainants are .informed and believe, and therefore charge, that there was not, on December 17, 1898, any town by the name of Las Vegas anywhere in the United States having any legal or corporate existence, or any defined boundaries, or that could take or acquire title, either equitable or legal, to any lands whatever; and further, that there was not at the time of the cession of the country, included in the Territory of New Mexico, to the United States by the Republic of Mexico, or at the time of the confirmation of the Las Vegas grant by Congress, any such own having any legal or corporate existence, or having *58 any defined boundaries, or any place by that name, capable in law of acquiring or holding title, either legal or equitable, to the lands included within the Las Vegas grant. And they further charge that they are advised, and so believe, that if a patent be issued to the town of Las Vegas the same would be void, for the reasons hereinbefore stated; and they charge that notwithstanding the facts before stated, the said Commissioner of the General Land Office, under the order and direction of the Interior Department, will issue the patent to the said town of Las Vegas, if not restrained from so doing by the court. They charge that a patent so issued would east a cloud and a suspicion upon their title and the title of those interested with them, and would result in irreparable injury to them all.
The bill prays for an injunction against the defendants, to restrain them from issuing a patent for said lands to the town of Las Vegas; or, if such patent has been issued, that the same be declared void and of no effect; and that said defendants be ordered and decreed to issue a patent for said lands to the complainants and those having an interest in common with them in said lands.
The defendants appeared and entered a demurrer to the bill, and stated as grounds for the demurrer, 1st, the want of ..jurisdiction in the court to grant the relief prayed, or any part thereof; 2d, the want of necessary parties to .the bill; and, 3d, that, upon the facts stated in the bill, there is no ground of relief shown, — the complainants having no such vested and exclusive rights in the lands as entitle them to a patent therefor.
The court below sustained the demurrer and dismissed the bill; and the complainants have appealed.
Before proceeding to examine and determine the several grounds of demurrer, it would seem to be proper to state in a preliminary way the general principles as . to what is and what is not admitted to be true by the demurrer to the bill; *59 and of what matters and facts the court will take judicial notice without the introduction of formal proof thereof.
It is a well settled principle in the law of demurrer, that while the demurrer admits as true, for the purposes of the decision invoked by it, all facts well and sufficiently pleaded, yet it does not admit as true mere matters of law which the pleader may think proper to state in his pleadings, nor the conclusions drawn from the facts stated therein. That is for the court exclusively. Nor does the demurrer in any manner admit the correctness of an allegation as to the construction of a statute, or of a grant, or other document, or official act, that may be insisted upon by the pleader, as the foundation of his claim and title, or that may be set up in opposition thereto. That is matter of law for determination by the court. These propositions are too clear to require citations of authority for their support.
And as to the question of what the courts will take judicial notice, it is settled by express authority, that the courts of the United States are bound to take judicial notice of the laws and regulations of Mexico existing prior to and at the time of the cession to this Government of the Territory of New Mexico, by the treaty of Guadalupe Hidalgo, in 1848. United States v. Chaves, 159 U. S. 452. And they must also take judicial notice of the facts concerning the land grants by Mexico, which are recited in acts of-Congress, and in the records of the General Land Office, or the Department of the Interior. Knight v. U. S. Land Association, 142 U. S. 161. In regard to the Las Vegas grant, that has been the subject of both departmental and Congressional action. It has been the subject of investigation by the surveyor general of New Mexico, under the act of Congress of July 22, 1854, and by his report was made a subject of record in the General Land Office, from whence it was placed before Congress, and by that body was confirmed by the act of June 21, 1860, by special designation. It has since been repeatedly the *60 subject of official action in the land department of the Government. With such publicity and official action in regard to the grant, the grant itself and the facts attending it, are matters of which the court must take judicial notice.
1. With respect to the first of the questions raised under the demurrer, that of the want of jurisdiction of the court over the subject matter of the bill, in view of the provision of the statute law, and the repeated decisions of the Supreme Court, upon the subject, no very extended discussion of the question is required of this court. By section 2447 of the Revised Statutes of the United States, it is declared and provided, that in case of any claim to land in any State or Territory which has heretofore been confirmed by law, and in which no provision is made by the confirmatory statute for the issue of a patent, it may be lawful, where survej's have been made, to issue patents for the claims so confirmed, upon the presentation to the Commissioner of the General Land Office of plats, etc., if the same be found correct by the Commissioner. “ But such patents shall only operate as a relinquishment of title on the part of the United States, and shall in no manner interfere with any valid adverse right to the same land; nor be construed to preclude a legal investigation and decision by the proper judicial tribunal between adverse claimants to the same land.”
It is alleged in the bill, as we have seen, that the defendants, in the execution of the functions of their office in the Department of the Interior, are about to issue, or have determined to issue, or, it may be, have issued, a patent to the town of Las Vegas for the land included in the Las Vegas grant, and have refused to issue a patent to the complainants and their associates for said land. And the question is, has a court of equity the power and jurisdiction to restrain this proposed or intended action of one of the executive departments of the Government, and to order the patent to be issued to the complainants? In other words, has a court of equity the power and jurisdiction to control and direct *61 the executive Department of the Interior in the matter of adverse claims to a patent for land, where there has been a confirmation by act of Congress, without directing to whom a patent should issue ? The confirmatory act of 1860, makes no provision for the issuing a patent, though it in terms confirms the claim for the land to the town of Las Yegas.
There are many things to be determined as preliminary to issuing a patent. The officer iutrusted with the power must determine whether there has been a confirmation, and, as in this case, where there are conflicting claims, to which of the parties claiming the patent the confirmation by act of Congress applies. He must also determine all questions as to the accuracy and validity of the survey, and as to all the conditions upon which the patent can rightfully issue. That being the case, can a court of equity draw all these questions to itself for determination, and thereby exclude the executive department of the Government from the exercise of the function and duty expressly delegated to it by statute? We think not.
This question has been the subject of repeated adjudication by the Supreme Court of the United States, and it has been uniformly held that the courts will not interfere, either by mandamus or injunction, with the exercise, by the executive officers, of duties requiring judgment or discretion. In the case of Litchfield v. The Registers and Receiver, 9 Wall. 575, this principle was applied to the register and receiver of the land office. That was a case quite analogous to the present, though in some of its facts not so strong for the application of the principle as the present case. The bill was filed against the register and receiver of the land office at Fort Dodge, asking an injunction to restrain them from entertaining and acting upon applications made to them to prove pre-emptions to certain lands which lay within the land district for which they were respectively register and receiver. The defendants demurred to the bill, and the bill was dismissed for want of equitable jurisdiction. The case *62 was taken to the Supreme Court, and that court, speaking by Mr. Justice Miller, said : “The principle has been so repeatedly decided in this court that the judiciary can not interfere, either by mandamus or injunction, with executive officers such as the respondents here, in the discharge of their official duties, unless those duties are of a character purely ministerial, and involving no exercise of judgment or discretion, that it would seem to be useless to repeat it here. In the case of Gaines v. Thompson, 7 Wall. 347, decided at the last term of this court, the whole subject was fully considered, and the cases in this court examined. The doctrine just stated was announced as the result of that examination. The case of The Secretary v. McGarrahan, decided at the present term, 9 Wall. 298, reaffirmed the principle which must now be considered as settled. Both these cases had reference to efforts similar to the present, to control the officers of the Land Department.”
Further on in the opinion, the learned justice said: “The very first duty which the register is called upon to perform, when an application is made to him to enter a tract of land, is to ascertain whether it is subject to entry. This depends upon a variety of circumstances. Has there been a proclamation offering it for sale? Has it been reserved by any action of Congress, or of the proper department? Has it been granted by any act of Congress, or has »it been sold already? These are all questions for him to decide, and they require the exercise of judgment and discretion. The bill shows on its face that these officers, in the exercise of this duty, were considering whether the reservations of the departments and the act of Congress, and the claim of the plaintiff under them, took these lands out of the category of lands subject to sale and preemption, and he asks the court to interfere by injunction to prevent them from determining that question, and that the court shall determine it for them. He says the court below erred because it did not require them to come in and answer to his claim of title, and at *63 their own expense to put the court in possession of their views, and defend their instructions from the Commissioner, and thus convert the contest before the land department into one before the court. This is precisely what this court has decided that no court shall do. After the land officers shall have disposed of the question, if any legal right of plaintiff has been invaded, he may seek redress in the courts. He insists that he now has the legal title. If the land department finally decides in his favor, he is not injured. If they give patents to the applicants for preemption, the courts can then in the appropriate proceeding determine who has the better title or right. To interfere now, is to take from the officers of the land department the functions which the law confides to them and exercise them by the court.”
The same principle is reasserted in the recent case of Brown v. Hitchcock, 173 U. S. 473, on an appeal taken from this court.
If it' be urged that a patent is necessary to enable the comp lain ants to assert their rights in an action at law, the answer to that contention is that it is settled doctrine, that a confirmatory statute passes a title as effectually as if it in terms contained a grant de novo, and that a grant may be made by law as well as by a patent issued m pursuance of-law. Ryan v. Carter, 93 U. S. 78. And this was expressly held by the Supreme Court in respect of the confirmatory act of Congress of June 21, 1860, — the act that confirmed the Las Vegas grant. Tameling v. United States Freehold, etc., Co., 93 U. S. 644, 661.
2. But assuming that there was jurisdiction in the court to take cognizance of the case as presented by the bill, it is then contended by the defendants that the bill is defective, and therefore demurrable, for want of proper and necessary parties defendants thereto. In an application to the Commissioner of the General Land Office to issue a patent under Sec. 2447 of the Rev. Stats. U. S., such an objection as this, *64 possibly, would not be entertained. But when a party comes into a court of equity for relief, he must conform to the established rules of proceeding, not only with respect to the subject-matter of the suit so as to furnish a proper foundation for the decree sought, but as to all necessary and proper parties who may be affected by. the decree.
In this case, it is very clear that the present defendants have no real interest in the subject-matter of the bill. They do not represent, in any proper sense, the town or the inhabitants of the town of Las Vegas. Their standing in court is simply in their official character, without any real interest in the subject-matter of the suit. The parties in real interest, adverse to the claim of the complainants, are the town of Las Vegas and the inhabitants thereof, and they are not parties and have no representative of their interest before the court. It would certainly appear to be contrary to the first principles of right and justice to proceed to grant tbe relief prayed for by this bill, in the absence of all representation of those most essentially interested in resisting and defeating the claim of the complainants.
This question was raised and very emphatically decided, in the case already referred to, of Litchfield v. Register and Receiver, supra. In disposing of this question, the court said: .“It appears on its face, (referring to the bill) that the register and receiver have no real interest in the matter, but that persons not named are asserting before them the legal right to preempt these lands. These persons are the real parties whose interests are to be affected, and whose claim of right is adverse to the plaintiff. If the court should hear the case, and enjoin perpetually the register and receiver from entertaining their applications, they have no further remedy. That is the initial point of establishing their right, and in this mode a valuable and recognized right may be wholly defeated and destroyed, without the possibility of a hearing on the part of the party interested. This is not a case in which the land officers represent these claimants. They *65 have no such duty to perform. They might let the injunction be issued without defense, and thus a proceeding almost ex parte be made to strangle the incipient right of the actual settler on the public lands. If it can be done in this case, it can be done in every other in which a plaintiff is willing to proceed against the officers, without bringing the settlers on the land before the court.” It was therefore held that the settlers were necessary parties.
It is alleged, however, that there is no such town as Las Vegas; or, at any rate, there is no incorporated town of that name in New Mexico, and, consequently, there is no body or legal entity that can be made a party defendant. But the fact of the existence of the town of Las Vegas can not be denied. It is a fact of which the court must take judicial notice. The existence of the town is recognized by the surveyor general of New Mexico, in his investigation of claims and titles to land under the act of Congress of 1854. It is also fully and repeatedly recognized in the land department of the Government, and by Congress in the reports of its committees, and in the act of confirmation of 1860. In addition to this, it appears on the maps of the Territory of New Mexico, and in the gazetteers of the country. And by the census returns of the United States for 1890, it is shown to be a town in San Miguel County, New Mexico, east of Santa Fe, containing, at that time, a population of 2,385 inhabitants; and was a railroad and manufacturing center.
But whether the town of Las Vegas be a municipal corporation, incorporated by virtue of statutory provision or not, is quite immaterial, so far as this case is concerned. In such case as this, it would be sufficient that such a number of the proprietors claiming under the grant embracing the town, or of those holding rights thereunder, were brought before the court, as would fairly represent the interest of all, the interests being of a common character and responsibility. This principle is established by many authorities, and is treated at large, with the citation of cases, in Story’s Equity *66 Pleading, in sections 116 to 126. Many instances are given, as where a bill was brought by the parson of a parish against some of the parishioners to establish a general right to tithes, and the others were held to be bound by the decree in the suit. And so, where there is one general right to demand service from the individuals of a large district, as, for example, a right to demand that all the individuals of a large district should grind all the corn for their subsistence at a particular mill; in such a case, the mill owner may sue a few in equity, to establish his right against all. But so many must be joined, as will fairly and honestly try the legal right. Sto. Eq. Pl., Sec. 123; Mayor of York v. Pilkington, 1 Atk. 282, 284; Adair v. New River Co., 11 Ves. 444; City of London v. Richmond, 2 Vern. 421; Milbank v. Collier, 1 Collyer, 237; Atty. Genl. v. Wyburgh, 1 P. Will. 599.
In view of all the facts of this case, and the terms of the confirmatory act of Congress, it would certainly not consist with any rational principle of justice that the rights of the people of the town of Las Vegas, whatever may be the nature of those rights, should be subjected to a cloud and embarrassment, and the claimants of those rights be subjected to expensive litigation, by the issue of a patent to the complainants, without an opportunity to the town and its inhabitants to be heard in vindication of their rights. We think the bill is defective for want of necessary parties, and is demurrable for that cause.
3. We might close the consideration of the case here, and affirm the decree below for the reasons we have stated. But as the case may be taken to the Supreme Court of the United States for final review, and the views we have expressed may not be concurred in, and especially as the appeal to this court was from the judgment of the court below sustaining the demurrer upon the ground that there was no right or title in the complainants that entitled them to a patent for the land, under the confirmatory act of Congress, we shall proceed to the consideration of the third ground of demurrer, *67 which involves the question as to the rights of the complainants and those represented by them to have the patent for the Las Vegas grant issued to them, under the act of confirmation, instead of the town of Las Vegas.
A. brief statement of the facts, showing the nature and condition of the grant, as made by the local officials of the Mexican government in New Mexico, would appear to be necessary to a fair understanding of the subject.
In March, 1835, a petition was preferred to the proper authorities in New Mexico for a grant of land under the colonization laws of the Republic of Mexico of 1824, and according to the regulations adopted by that government in 1828. The petition was filed by Juan de Dios Maese, Miguel Archuleta, Manuel Duran, Jose Antonio Casaos, and, for themselves and in the name of twenty-five other men, stating that, having registered a vacant and uncultivated piece of land, commonly known by the name of Las Vegas, on the Gallinas river, they solicited said land for the purpose of planting crops, and to have also the necessary land for pasture and watering places, etc., with definite boundaries. They stated that they were willing to bind themselves to receive possession of the land in the name of the federation, and to comply with the reasonable and equitable conditions that might be prescribed. This application, in due course of proceeding, was laid before the territorial deputation of New Mexico; and thereupon it was resolved and ordered, that “the land contained within the boundaries expressed in this petition is granted not only to the petitioners and the residents of El Bado but also generally to all who may be destitute of lands to cultivate; provided, ‘that the grant to these lands is made on condition that the pasture and watering places are free to all.’ In view of all which, the political chief will receive the petitions made, and shall cause them to be provided for, agreeably to what has been ordered. In compliance with instructions let these original proceedings be forwarded to the political chief, who will be pleased to execute what is *68 herein ordered by this deputation, by whose order the foregoing is done.
“ R. Abren, Secretary, (Rubric).”
Then proceeding was taken by the officials of the Territory to place the parties in possession of the land granted, under the decree of the deputation, and to award to the parties entitled, portions of the land, with instructions as to their duties and liabilities under the grant; and such parties were informed and directed, “that the water and pasture were free to all, and that the joint labor should be done by themselves without any dispute, and that the wall surrounding the town marked out should be made by them all, which being done, that they notify the justice, in order that he may mark out to each one equally the portion he is entitled to.”
Under the act of Congress of July 22,1854, (10 Stat. 308), passed to give effect to the provisions of the treaty of Guadalupe Hidalgo, between the United States and the Republic of Mexico, made in 1848, there was a petition filed with the surveyor general of New Mexico, by Francisco Lopez, Henry Connelly and Hilario Gonzales, on behalf of themselves and a large number of citizens of the United States, residents of the town of Las Vegas and its vicinity, in the county of San Miguel, Territory of New Mexico, representing that they, and the citizens they represented, were the claimants and legal owners of a certain tract of land, lying, etc., which lands were granted by the provincial deputation to Maese and twenty-eight others, and to which petition was appended the grant under which they claimed. There was also an adverse claim to the same land filed with the surveyor general, by the heirs of Luis Maria Baca, founded upon a grant prior in date to that made to Maese and others.
The surveyor general of the' Territory acted upon these claims under the act of 1854; and in his report to the Commissioner of the General Land Office, he stated that — “ It is firmly believed that the land embraced in either of the two *69 grants is lawfully separated from the public domain and entirely beyond the disposal of the general Government; and that in the absence of the one the other would be a good and valid grant.” But, by this report, the question of the title was referred to the proper tribunals to settle; and these claims with others, referred to in the report, were placed before Congress for its legislative action. In the committee on private land claims of the Senate, of which committee Senator Benjamin was chairman, the subject of the claims referred to in the report of the surveyor general of New Mexico was fully considered. And that committee, in a report to the Senate, in speaking of the Las Vegas grant, and the adverse claims made to the lands embraced therein, said : “ Amongst the claims embraced, however, in the second report and recommendation for confirmation are two which cover the same tract of land, and are embraced in one number, to wit, No. 20. To this tract the two claimants are, first, the heirs of Luis Maria Baca, who claims under a grant made by the provincial deputation of Durango to said Baca and his seventeen male children, on May 29, 1821, etc. This grant was in fee, and is a genuine and valid title; and, second, the town of Las Vegas. This town claims under a grant made on the 25th of March, 1835, to Juan de Dios Maese and twenty-seven others by the territorial deputation on a petition which represented the land to be public land, and the petitioners were put in possession. The land has been divided out, and several hundred families are located on it.
“ The surveyor general, having none but ministerial duties to perform, has recommended the confirmation of both these titles, leaving to the respective claimants the right of adjusting their conflicting claims in the courts; but Congress has other duties imposed on it, and is bound to legislate in such manner as to prevent, if possible, so disastrous a result as the plunging of an entire settlement of families into litigation, at the imminent hazard of being turned out of their homes or made to purchase a second *70 time from a private owner of lands for which, they paid their government a full equivalent in the labor, risk, and exposure, by which they have converted a wilderness, surrounded by hostile savages, into a civilized and thriving settlement; and this can be done with little loss or cost to the government.”
The committee then proceeded to devise and report a method whereby the heirs of Baca should abandon or surrender their older and superior claim to the land, and take other lands of the government in lieu thereof, so that the Las Vegas grant might be confirmed to the town of Las Vegas, according to the findings and recommendation of the surveyor general; and for that purpose the committee reported an amendment to the bill which had been passed by the House of Representatives and was then pending before the Senate. That amendment was adopted, and the bill as amended was passed into a law. By that law the Las Vegas graut was confirmed to the town of Las Vegas “as recommended for confirmation by said surveyor general in his report and abstract marked exhibit A, as communicated to Congress by the Secretary of the Interior, etc., and numbered from twenty to thirty-eight, etc., with the exception of claim -numbered twenty-six,” etc., which was another and different claim from that of Las Vegas. By the sixth section of the confirmatory act of 1860, it was provided, that it should be lawful for the heirs of Luis Baca, “who make claim to said tract of land as is claimed by the town of Las Vegas, to select instead of the land claimed by them an equal quantity of vacant land, not mineral, in the Territory of New Mexico, to be located,” etc. The Baca heirs accepted the terms proposed, and made their selection of other lands; and the town of Las Vegas, and the people settled within the limits of the graut of Las Vegas, were thus left in the free and undisturbed possession of the land granted to them and of their homes, with all the rights and privileges professed to be *71 conveyed by the grant. It is manifest be3ond doubt as to the purpose and intention of Congress in its action upon the subject. It was not the intention or purpose of Congress thus to provide for the extinguishment of the older and superior title of Baca’s heirs, for the benefit and protection of a few private individuals who might claim individual rights under the grant of Las Vegas, to the exclusion of all claim of the town of Las Vegas, and the inhabitants of the land within the limits of that grant. The inhabitants of the grant have remained undisturbed, and their rights unchallenged, until within a few years past, since which time their rights have been brought into question by parties who attempt to assert and maintain exclusive individual rights to the land embraced within the Las Vegas grant.
By the treaty of Guadalupe Hidalgo the United States stipulated for full and complete protection of all rights of property, perfect or imperfect, held by the inhabitants of the territory ceded, and that such rights should be secured to them, so far as such property was recognized by the laws and constitution of the new government; and for that purpose that the holders should receive from the new authorities such official and documentary evidence of their rights as would assure their full possession and enjoyment. Pueblos or towns in that respect stood in the same position as private individuals. All their rights of property, legal or equitable, were alike entitled to protection. The confirmation of the claim of title, whatever that title might be, took effect upon the title as it existed at the time of the acquisition of the Territory; and, by the subsequent confirmation,.the United States recognized the validity of that title‘at the date of the treaty. Knight v. U. S. Land Asso., 142 U. S. 161, 186, 201.
As we have shown, by the recitals of the decree of the deputation of New Mexico, of March 23, 1835, the grant was not onty to Maese and his associates named, in their individual rights, but was “to the petitioners and the residents of El Bado, and also generally to all who might be destitute *72 of lands to cultivate; provided that the grant of these lands is made on condition that the pasture and watering places are free to all.” The parties entitled under the grant were let into possession under instruction “ that they should select a site for a town to be built by the inhabitants; that the joint labor should be done by themselves without any dispute, and that the wall surrounding the town marked out should be made by them all.”
Such rights as were conferred by this grant were of a communal nature, and such as are recognized by the modern civil codes of continental Europe; and especially by the laws and customs of Spain, and which have been largely recognized in the laws and ordinances adopted for the settlement and government of her colonies on this continent. Townsend v. Greeley, 5 Wall. 326; 336 ; 1 Domat, Prel., Bk. Tit. 2 S. 2, Art. 15, Par. Ill; or p. 148.
As said by the Supreme Court, speaking by Mr. Justice Field, in the case of Townsend v. Greeley, supra, “ It may be difficult to state with precision the exact nature of the right or title which the pueblos held in these lands. It was not an indefeasible estate; ownership of the lands in the pueblos could not in strictness be affirmed. It amounted in truth to little more than a restricted and qualified right to alienate portions of the land to its inhabitants for building or cultivation, and to use the remainder for commons, for pasture lands, or as a source of revenue, or for other public purposes. This right of disposition and use was, in all particulars, subject to the control of the government of the country.” It is very clear, therefore, that the land embraced in the grant of Las Vegas was not intended to be assigned to Maese and his associates in absolute property, to them and their heirs, but was intended to be held by them in trust for the benefit of the inhabitants that might settle thereon. This was manifestly the view entertained and enacted into law by Congress, in confirming the right to the town of Las Vegas. This is the view entertained and officially announced *73 and applied by the land department of the government, upon more than one occasion.
In 13 Land Dec. 646, 655, Secretary Noble of the Interior Department has discussed the question of the confirmation of this grant, and to whom the confirmation was made, with great fullness and clearness. He says: “ My opinion is that . . . the confirmation was made direct to the town, not only as the most convenient form of making the confirmation and issuing a patent thereon, but because the town of Las Vegas, acting in the interest and for the benefit of its people, was the proper party to ask for and receive from Congress the relief sought. A patent for said lands should be issued to the town of Las Vegas, so that the proper parties in interest could perfect their titles to their lands. . . .
“As to the point that the town of Las Vegas, not having been incorporated, is a legal nonentity, to which no title would pass under the patent, it may be replied that, if this be true, as matter of fact and law, the consequences would be more far reaching ; for Congress, in its wisdom, confirmed the grant, as shown, to the said town, and if there be no such town in existence which can take there simply has been no confirmation of the grant, and nobody is as yet entitled to a patent. But I do not understand this to be the law of this case.
“Under the Mexican law or system, originally the people were required, for self-protection and other reasons, to live in towns while cultivating outlying land, and the general laws of that country gave to such towns or pueblos four square leagues of land for the use of the inhabitants thereof, and occasionally by special concession, as in the present instance, grants of larger area were made for the same purpose. None of these towns were ever incorporated, in the sense in which we use the term, so far as my researches have gone. They were aggregations of people who lived together for mutual protection, and under the laws and customs of that country had officers for the administration *74 of their municipal affairs; but there was no actual charter— no act of incorporation conferred by the superior power of the State — only the implication arising from the recognition of the existence of such towns, with authority to guide their own town affairs.
“This was the condition of things when New Mexico was acquired by the United States, and the legal status of these towns and their capacity to take as confirmees of grants of public lands have been recognized in too many instances by Congress and the executive departments through too long a period of time to be now seriously questioned.
“In the case under consideration the town of Las Vegas was not in existence at the time the original grant was asked for by Maese and his associates. One of the purposes for which the concession was made was to establish that town, and it was established after the manner and under the laws of Mexico, and has had an actual existence ever since. Congress recognized its legal and actual existence) ignored the original petitioners for the grant and confirmed it to the town, and, to that extent, made a change in the trustee. In view of all this it is too late now to say that Las Vegas has no legal existence. If a corporate capacity be necessary to enable the town to take under the grant, every presumption must be that it has the necessary corporate capacity, and the law so implies. Dillon, Mun. Corp., Secs. 21, 22. At all events, the town having an actual existence, this department will not challenge its capacity to take what Congress clearly intended to give.”
These views of the Secretary of the Department of the Interior were reiterated and enforced by him, on motion for reconsideration of his first decision, and the motion for reconsideration was accordingly overruled. 15 Land Dec. 58.
Upon consideration of the several grounds of demurrer assigned, and of the whole case, we are of opinion that the decree of the court below, dismissing the bill, should be affirmed; and it is so ordered. Decree affirmed.