## UNITED STATES *v.* CHAVES.

APPEAL FROM THE COURT OF PRIVATE LAND CLAIMS.

No. 196. Argued October 28, 1895. — Decided November 11, 1895.

It is the usage of the civilized nations of the world, when territory is ceded, to stipulate for the property of its inhabitants.

The courts of the United States are bound to take judicial notice of the laws and regulations of Mexico prior to the cessions under the treaty of Guadalupe Hidalgo, and the treaty of December 30, 1853.

It is the general rule of American law that a grant will be presumed upon proof of an adverse, exclusive, and uninterrupted possession for twenty years, and such rule will be applied as a *presumptio juris et de jure* whenever, by possibility, a right may be acquired in any manner known to the law, including occupations of claimants under alleged Mexican grants prior to the said treaties.

On the facts the court decides that the land in controversy in this case was the property of the claimants before the treaties with Mexico, and consequently that its protection is guaranteed as well by those treaties as by the law of nations.

THIS is an appeal on behalf of the United States from a decree of the Court of Private Land Claims, made on the 26th day of September, 1892, in the matter of the claim for certain lands in Valencia County, New Mexico, commonly called the " Cubero" land grant.

The case as presented in the pleadings is as follows:

It is claimed by the petitioners that in the year 1833 the Republic of Mexico, by Francisco Sarricino, the governor of the Territory of New Mexico, granted to Juan Chaves, and about sixty others, " and to the town of Cubero, whose establishment and incorporation were intended and declared by the terms of said grant," a tract of land now situated in the county of Valencia, New Mexico.

The description of the land as claimed is set out in the petition, and is there said to contain about eleven square leagues.

They allege the loss and destruction of said grant and the testimonio as a reason for not being able to state accurately its date or the description of the land or the act of possession.

They allege that the chief alcalde of that jurisdiction did, during the same year, put them in possession, but they are unable to state who was the alcalde or what the date was of such delivery of possession.

That the petitioners are the heirs and legal representatives of the original grantees, except Juan Antonio Duran, who is the only survivor of such grantees.

That they are now in possession and occupation of said land, claiming under said grant.

That said grant was unconditional, except so far as the colonization law imposed conditions.

They charge that preliminarily to the making of the said grant the said governor required the parties petitioning first to purchase certain improvements which had been made upon the said land by one Francisco Baca, a Navajo Indian chief, who had been residing on the tract by permission of the government.

That they did purchase of said Indian chief the said improvements which said Indian chief relinquished to them and vacated the land.

That said preliminary conditions have been performed, the governor and chief alcalde delivered to the grantees a duplicate of the granting decree and of the act of juridical possession, and placed the originals of said decree and act in the Mexican archives at Santa Fé.

They allege that said originals, although once in the custody of the defendant (the United States) after the solemnization of the treaty of Guadalupe Hidalgo, were wrongfully and negligently destroyed or lost by the defendant.

That the duplicates were entrusted by the grantees to Juan Chaves, one of their number, and he kept them until his death in 1846. Since his death they have not been found, and plaintiffs aver that they were stolen and carried away and destroyed or lost by one Vicente Margarito Hernandez.

They charge that the original grant papers having been lost, a controversy arose between the petitioners and the pueblo of Laguna in the year 1841, and in that controversy the boundary line on the side next to Laguna was fixed and adjusted.

They allege that the grant was made to the inhabitants of Cubero at that time for the purpose of establishing a town thereon, and that since that time they have been in possession of the whole of the ground.

The answer of the United States puts in issue all of the allegations of the petition.

It denies that there was ever a grant made by the governor of New Mexico to the alleged grantees, as alleged in the petition.

It denies that the alleged testimonio of said grant was ever lost or destroyed, and that the possession of said plaintiffs or any of them was derived by the act of any official of the Mexican government authorized by the laws of Mexico to grant or deliver the same.

It denies that the duplicate of the alleged granting decree and act of possession was ever delivered by the governor or chief alcalde to the alleged grantees, or was ever placed by the governor among the Mexican archives of Santa Fé.

It avers that, if a grant was made to the alleged grantees

for the purpose of establishing a town, the conditions imposed by law have never been complied with, and, therefore, they are not entitled to confirmation under the act creating the Court of Private Land Claims.

That a large portion of said grant had been disposed of by the United States to the Atlantic and Pacific Railroad Company, and that it was a necessary party defendant, and a misjoiner of parties was pleaded.

On August 29, 1892, the court entered a decree confirming the grant, and denying the right of the Atlantic and Pacific Railroad Company to intervene, except so far as its right of way was concerned, which right was admitted by the plaintiffs, from which decree an appeal was taken by the United States.

*Mr. Solicitor General* and *Mr. Matthew G. Reynolds* for appellants.

No appearance for appellees.

MR. JUSTICE SHIRAS, after stating the case, delivered the opinion of the court.

It is provided in the ninth section of the act of March 3, 1891, c. 539, 26 Stat. 854, establishing the Court of Private Land Claims, that, upon any appeal from such court, "the Supreme Court shall retry the cause, as well the issues of fact as of law, and may cause testimony to be taken in addition to that given in the court below, and may amend the record of the proceedings below as truth and justice may require; and on such retrial and hearing every question shall be open."

The present case has been submitted to us on the record of the court below, containing the pleadings, the evidence, and the decree.

The decree finds as follows: "That the complainants are citizens of the United States and residents of the county of Valencia, in the Territory of New Mexico; that in the year 1833 a colony grant of the lands in controversy was made by the proper authority of the Republic of Mexico through the governor of the Territory of New Mexico, Francisco Sarricino,

to Juan Chaves and sixty-one others, for the purpose of colonizing the place of Cubero, and that said colonization was had and made; that the title to the land in controversy in this cause is derived from the Republic of Mexico, and was complete and perfect at the date when the United States acquired sovereignty in the Territory of New Mexico, within which this land was situated; that the said complainants are in the possession of the said land embraced within the calls of the said grant, and claim the same; that they and their ancestors and predecessors in right have been in the possession of the same since the issuance of the grant by the Mexican government, and that complainants have such a claim and interest in the land as gives them a right to apply to the court for a confirmation of their title; that the lands claimed embraced an area of about sixteen thousand acres, but the exact area cannot be stated, as the same has never been surveyed; that the intervenor, the Atlantic and Pacific Railroad Company, has no right in or to the real estate and lands included within said grant, except to its right of way for its railroad track as now laid down and operated through and across said lands, which right of way was conceded to said railroad company by said complainants on the trial of the cause."

If these findings of fact are sustained by the evidence in the record, the decree of the court below, adjudging the title and claim of the complainants to be good and valid, and confirming the same in them, their heirs, successors, and assigns, should be affirmed.

The act provides that all proceedings subsequent to the petition shall be "conducted as near as may be according to the practice of courts of equity of the United States; . . . and that, by a final decree, the court shall settle and determine the question of the validity of the title and the boundaries of the grant or claim presented for adjudication, according to the law of nations, the stipulations of the treaty between the United States and the Republic of Mexico in 1848, and the treaty between the same powers in 1853, and the laws and ordinances of the government from which it is alleged to have been derived."

The first rule of decision thus laid down by Congress for our guidance is that we are to have regard to the law of nations, and as to this it is sufficient to say that it is the usage of the civilized nations of the world, when territory is ceded, to stipulate for the property of its inhabitants. *Henderson* v. *Poindexter*, 12 Wheat. 530, 535; *United States* v. *Arredondo*, 6 Pet. 691, 712; *United States* v. *Ritchie*, 17 How. 525.

We adopt the language of Chief Justice Marshall in the case of the *United States* v. *Percheman*, 7 Pet. 51, 86, as follows: " It may not be unworthy of remark that it is very unusual, even in cases of conquest, for the conqueror to do more than to displace the sovereign and assume dominion over the country. The modern usage of nations, which has become law, would be violated; that sense of justice and of right which is acknowledged and felt by the whole civilized world would be outraged, if private property should be generally confiscated and private rights annulled. The people change their allegiance; their relation to their ancient sovereign is dissolved; but their relations to each other and their rights of property remain undisturbed. If this be the modern rule, even in cases of conquest, who can doubt its application to the case of an amicable cession of territory?"

We are next directed to consider the stipulations of the treaties between the two governments. The provisions of the treaty of 1848 relevant to the present subject are contained in its eighth article, 9 Stat., 929, and we find that they declare that " Mexicans now established in territories previously belonging to Mexico, and which remain for the future within the limits of the United States, as defined by the present treaty, shall be free to continue where they now reside, . . . retaining the property which they possess in said territories. . . . In the said territories, property of every kind, now belonging to Mexicans not established there, shall be inviolably respected. . . . The present owners, the heirs of these, and all Mexicans who may hereafter acquire said property by contract, shall enjoy with respect to it guaranties equally ample as if the same belonged to citizens of the United States." And in the ninth article it is further pro-

vided that, pending the admission of such territories into the Union of the United States, Mexicans who reside therein "shall be maintained and protected in the free enjoyment of their liberty and property, and secured in the free exercise of their religion without restriction."

The sixth article of the treaty of December 30, 1853, 10 Stat. 1035, provides that "no grants of land within the territory ceded by the first article of this treaty bearing date subsequent to the day — twenty-fifth of September — when the minister and subscriber to this treaty on the part of the United States proposed to the government of Mexico to terminate the question of boundary, will be considered valid or be recognized by the United States, nor will any grants previously made be respected or be considered as obligatory which have not been located and duly recorded in the archives of Mexico."

With such articles contained in the treaties and their meaning submitted to our consideration, we have no difficulty in holding that the question is whether the land in controversy was the property of the claimants before the treaties, and, if so, that its protection is guaranteed by the treaties as well as the law of nations.

The next guide prescribed by the act is a regard for "the laws and ordinances of the government from which it — the grant — is alleged to have been derived."

In this part of our inquiry we shall draw our information from a treatise on the Spanish and American land laws, recently published by Matthew G. Reynolds, the United States attorney for the Court of Private Land Claims, and which is referred to in the brief filed for the government in the present case. From this we learn that the general constituent Congress of Mexico passed, on August 18, 1824, a colonization law, providing for the colonization of the territories of the Republic; that New Mexico, at the date of the passage of this law, was a territory, and so continued until December 30, 1836, when it became a department.

A code of colonization was adopted on November 21, 1828, which contains regulations for the colonization of the terri-

tories, whereby the political chiefs or governors of the territories are authorized to grant the public lands of their respective territories to contractors, families, or private persons, Mexicans or foreigners, who may apply for them, and are directed, when a grant is definitely made, to sign and give a document to serve as a title to the party in interest, it being stated therein that the grant is made in entire conformity with the provisions of the law, in virtue of which the possession shall be given.

A question is raised in the brief for the government whether the courts of the United States can take judicial notice of the laws and regulations of Mexico pertaining to grants made prior to the cession. It was said in *Fremont* v. *United States*, 17 How. 542, 557, referring to a similar question under the treaties with Spain, ceding territories to the United States, "it is proper to remark, that the laws of these territories under which titles were claimed, were never treated by the court as foreign laws, to be decided as a question of fact. It was always held that the court was bound judicially to notice them, as much so as the laws of a State of the Union. In doing this, however, it was undoubtedly often necessary to inquire into official customs and forms and usages.".

The same position was asserted in the case of *United States* v. *Perot*, 98 U. S. 428.

It is, indeed, suggested that the seventh section of the act establishing the Court of Private Land Claims, in respect that it provides that " the decree shall in all cases refer to the treaty, law, or ordinance under which such claim is confirmed or rejected," implies a contrary view. We do not so regard that provision, nor do we perceive in any features of the act an intention on the part of Congress to restrict the powers of the court recognized by the previous decisions.

We shall now proceed to apply these principles to the facts of the case.

It is conceded by the government's brief that the claimants or their ancestors did come to Cubero in 1833, and were put in possession of the lands claimed, and have held them ever since.

But it is contended that there is no sufficient evidence that the title asserted by the claimant was lawfully and regularly derived from the government of Spain or Mexico, or from any of the States of the Republic of Mexico having lawful authority to make grants of land, as prescribed by section 13 of the act; and it is said that the only title and interest acquired by the claimants was purchased by these settlers from one Francisco Baca, a Navajo Indian.

We have examined the evidence on this point contained in the record, and are of opinion that it warranted the finding of the court below that the complainants' title was derived from the Republic of Mexico, and was complete and perfect at the date when the United States acquired sovereignty in the Territory of New Mexico, within which the land was situated.

Without undertaking to give the evidence in full, we shall briefly state its principal features.

Penito Baca, a witness on behalf of the claimants, testified that he was eighty years old, and had resided on these lands since the year 1833; that the settlers were put in possession by the government; that Sarracino was governor, who held the government at Santa Fé. He enumerated by name a number of the colonists, and stated that there was in their possession a written grant from the governor, which he had heard read and had seen; that this writing, which was in the custody of Juan Chaves, could not be found after the death of the latter. He also described the boundaries of the grant, and testified that portions of these lands were distributed among the settlers, twenty-five varas to each, and that the remaining land was given for the common use for the stock of all.

Jose Antonio Duran testified that he was ninety-two years of age; that he was one of the settlers of the town of Cubero in the year 1833, and had there resided ever since; that their title was a written title, made to them by Francisco Sarracino, the governor. He gave a description of the boundaries of the land and the names of some of the original settlers of 1833. He stated that Don Juan Chaves and Don Juan Garcia, as commissioners, put them in possession. The witness could read and write Spanish, and he had seen and read the written title

from the governor, Sarracino. He testified that when Juan Chaves died the title paper was missing, and that it was currently reported that one Vicente Margarito Hernandez, who had been his secretary, had carried off the testimonio or official copy of the grant; that since 1833 the settlers and their children have lived upon and cultivated the land. He further stated that when they applied for the grant from the government, an Indian, named Francisco Baca, was on the land, and that it was made a condition that the Indian would abandon it.

Pablo Pino was a witness, eighty-two years of age, and had lived in the town of Cubero for forty-eight years, where he had purchased some land from the original settlers, in possession of which he had remained ever since.

Pedro Molina, eighty years of age, was one of the original settlers in 1833, and had lived with his children on these lands, and cultivated them ever since.

Juan Duran had lived in Cubero since 1833. His father and grandfather were original settlers. He had heard the original grant read. The papers were in the possession and read by Juan Garcia and one Juan Chaves, judge and commissioner. That it was one of the conditions before they were allowed to settle that they should buy the claim of Francisco Baca, the Navajo Indian. This witness testified to the tradition that the title papers of the grant had been stolen or carried away by Vicente Margarito Hernandez. The witness had been a school teacher for many years; could read and write Spanish, and had seen the original testimonio of the grant and heard it read, and that it was given by the governor Francisco Sarracino.

The record likewise contains translations of documents found in the archives of Valencia County, pertaining to a dispute between the town of Cubero and the pueblo of Laguna as to boundaries. These papers were dated in 1835, 1840, and 1841, and disclose a settlement of the dispute, certified to by Jose Francisco Chaves of Baca, judge commissioner in the second district of the department of New Mexico. In this certificate the lands within Cubero are stated to have been purchased from Francisco Baca, the Navajo.

A number of original deeds were likewise in evidence, variously dated from 1841 to 1856, showing sales of parcels of these lands; also a petition by the people of the town of Cubero to the surveyor general of the Territory of New Mexico, dated April 2, 1856, stating that they were in possession under authority of a grant from the Mexican government about the year 1834; that the original documents were lost; and asking that their lands should be surveyed, etc.

The claimants likewise proved, by quite a number of witnesses, residents of the Territory of New Mexico, that about 1870, a considerable portion of the archives of that Territory, containing documents relating to Mexican grants made to lands within that Territory, were lost; that these papers were deposited in the territorial library, where some of the witnesses had seen them in 1868 and 1869 ; that they were sold as waste papers by the Librarian Bond, and were scattered through the country. Many of these were Spanish documents and pertained to grants of land. When the governor of the Territory heard that there was complaint made by the people of this treatment of public archives; he made efforts to get them returned, but the evidence is clear that many of them were destroyed and lost. The claimants also called as a witness William M. Tipton, who had been employed for several years in the office of the surveyor general of the Territory of New Mexico, and had charge of the Spanish and Mexican archives. He testified that the books and records in that office purporting to contain the registry of land grants made by the Spanish and Mexican governments, prior to the time the government of the United States took charge, are in a disconnected, fragmentary form, and that one of the most important books, containing a record of grants made by the Spanish and Mexican governments, is missing, and is supposed to have been stolen. He also stated that there was not in the surveyor general's office any index of the dates, list of original expedientes or warrants of title to Spanish and Mexican grants.

This evidence was adduced to sustain the allegation in the petition that the governor and chief alcalde delivered to the settlers a duplicate of the granting decree and of the act of

juridical possession of the chief alcalde in the premises, and placed the originals of said decree and act in the Mexican archives at Santa Fé, and that said originals, with a great part of other valuable archives of the Mexican government, although once in the custody of the United States after the treaty of Guadalupe Hidalgo, were negligently destroyed or lost.

The only evidence adduced by the United States was the testimony of Ira M. Bond, who had acted as territorial librarian in 1869 and 1870, and who testified that, under instructions of Governor Pile, he had sold and disposed of a lot of the old records, supposing them to be of no value; that this created quite a talk in the town; that, finally, the governor instructed him to recover them back, and that most, but not all, of them were recovered. This witness said that he could not read Spanish; that these documents were in that language, and that there might have been grants among them.

In view of this large body of uncontradicted evidence we think that the court below was plainly right in finding that the claimants had satisfactorily sustained the allegations of their petition. Not only was there evidence of the existence of an original grant by the government of New Mexico, and of the loss of original records sufficient to justify the introduction of secondary evidence, but there is the weighty fact that for nearly sixty years the claimants and their ancestors have been in the undisturbed possession and enjoyment of this tract of land. The counsel for the government, indeed, contend that the Court of Private Land Claims and this court have no power to presume a grant upon proof of long-continued possession only; that their power is confined to confirming grants lawfully and regularly derived from Spain and Mexico.

It is scarcely necessary for us to consider such a question, because, as we have seen, there is ample evidence from which to find that these settlers were put in juridical possession under a grant from the governor of New Mexico, who, under the laws then in force, had authority to make the grant. However, we do not wish to be understood as undervaluing the fact of a possession so long and uninterrupted as disclosed

in this case. Without going at length into the subject, it may be safely said that by the weight of authority, as well as the preponderance of opinion, it is the general rule of American law that a grant will be presumed upon proof of an adverse, exclusive, and uninterrupted possession for twenty years, and that such rule will be applied as a *presumptio juris et de jure*, wherever, by possibility, a right may be acquired in any manner known to the law. 1 Greenleaf Ev. 12th ed. § 17; *Ricard* v. *Williams*, 7 Wheat. 59, 109; *Coolidge* v. *Learned*, 8 Pick. 503.

Nothing, it is true, can be claimed by prescription which owes its origin to, and can only be had by, matter of record; but lapse of time accompanied by acts done, or other circumstances, may warrant the jury in presuming a grant or title by record. Thus, also, though lapse of time does not, of itself, furnish a conclusive bar to the title of the sovereign, agreeably to the maxim, *nullum tempus occurrit regi;* yet, if the adverse claim could have a legal commencement, juries are advised or instructed to presume such commencement, after many years of uninterrupted possession or enjoyment. Accordingly, royal grants have been thus found by the jury, after an indefinitely long-continued peaceful enjoyment, accompanied by the usual acts of ownership. 1 Greenl. Ev. § 45.

The principle upon which this doctrine rests is one of general jurisprudence, and is recognized in the Roman law and the codes founded thereon, Best's Principles of Evidence, § 366, and was, therefore, a feature of the Mexican law at the time of the cession.

Finally, the rule of the law of nations, that private property in territory ceded by one nation to another, when held by a title vested before the act of cession, should be respected; the express provisions to that effect contained in the treaty between Mexico and the United States; the evidence of the fact of a grant, legal under the forms of Mexican law, and of a juridical possession given thereunder, and the strong presumption growing out of an exclusive and uninterrupted possession and enjoyment of more than half a century, bring us to concur in the decree of the court below.

The objection that the Atlantic and Pacific Railroad Company, as grantee from the United States, of a part of the tract in question, was a necessary party defendant, has not been pressed in argument, and we only notice it to say that, under the provisions of the fifth section of this act, the private rights of third parties are not affected by any proceeding or decree under said act.

The decree of the court below is

*Affirmed.*