# UNITED STATES

*v.*

# SAINT JOHN'S GAS COMPANY, LTD.

---

Law, No. 308.

1. A censo redimible, or fee-farm or ground rent, that was good against the Spanish government previous to the date of the treaty of Paris, is good against the government of the United States since that date, in favor of the holder of the land described therein.

2. There is nothing in or about such a censo redimible, as known to the civil law, especially when the same is against the national government, that renders it invalid as a perpetuity, and, in any event, if the government requires the ground in question, it can expropriate the rights of the payor of the censo therein.

United States v. St. John's Gas Co.

3. Where the Spanish government in Porto Rico sold land á censo at public sale, the public advertisement of the sale and the bid of the purchaser, together with the confirmation of the sale and the receiving of annual canons thereafter, are a sufficient written contract between the parties to comply with the requirement of the Spanish Code that censos redimibles must always originate in a written instrument.

4. *Quære* and not decided: Whether a censo redimible between private parties is obnoxious to the laws of the United States or of Porto Rico, as a unilateral perpetuity.

5. The fact that the legal title to land is inscribed in the name of a plaintiff in ejectment is not sufficient, as and of itself, to entitle him to a judgment, as he must also be entitled to the possession of the land; and a defendant having the equitable title, and being entitled to the possession, can defeat the cause of action.

Opinion filed October 25, 1909.

---

*Mr. J. R. F. Savage,* United States Attorney, for the plaintiff.

*Messrs. R. S. Rounds* and *E. S. Paine,* for the defendant.

RODEY, Judge, delivered the following opinion:

This is a plain suit in ejectment. It has been on the docket a little over four and a half years, having been filed on April 26, 1905. It was tried before the court and a jury in February, 1906, when, at the end of the cause, on motion of the plaintiff, the court, by a former incumbent of this bench, instructed the jury to find for the plaintiff, because, as alleged, the proofs of the defendant at best showed only an equitable title, which could not prevail against the alleged legal title of the plaintiff.

United States v. St. John's Gas Co.

A motion for a new trial was pending at the time the present incumbent qualified,—in fact, the new trial had been granted; but as the order therefor had been made by the former judge at a time when he was in the city of Pittsburg, Pennsylvania, we held that the weight of authority is that he was without power to make such an order while out of his district; but as the setting aside of the order left the motion still pending, and as the former judge, over his own signature, had confessed that he had committed error, we granted the motion for a new trial under date of August 7, 1906.

After opposition thereto, the defendant then amended its pleadings in several respects at different times up to the date of the second trial. The parties, by a proper stipulation, entered in open court, waived a jury, and submitted the whole matter to the court for decision on the merits and on all points of law and fact. After considerable delay, a trial was had in the forepart of January, 1909, when a large amount of oral evidence was taken and a large number of exhibits were introduced in evidence. The exhibits consisted mostly of letters, expedientes, records, and papers from the insular archives, and from the archives of the city of San Juan. The evidence alone, when transcribed, made about 113 typewritten pages. At the end of the trial, counsel for the respective sides, in addition to having, during the trial, each at the proper time moved for a verdict and judgment in favor of their respective clients, argued the case orally at length, and thereafter, within the next few months, each filed elaborate and painstakingly written arguments and briefs. These briefs are unusual in that they consist almost entirely of references to Spanish royal decrees and edicts, and the citation of Spanish and American decisions and

law regarding censos, canons, perpetuities, prescriptions, etc.

The suit is for a small tract of land consisting of seven distinct lots and containing a total area of 5,860 square meters. It is situated adjoining the present United States Naval Station in the center of what is known as the "marina," on the land projection that juts south into the bay of San Juan, Porto Rico, opposite the main portion of the city.

Defendant's rights, if any, as to the easterly tier of lots numbered 33, 34, and 45 began at a "remate" or sale thereof, under direction of the then Spanish authorities, which took place on May 22, 1854; and its rights, if any, as to the westerly tier of lots numbered 30, 32, 35, and 46 began at a similar sale, which took place about two years later, on January 18, 1856. The defendant, by itself and its predecessors in interest, claims to have been in exclusive, open, notorious, and uninterrupted possession of all the lots and tract of land mentioned from that time forward for fifty-one and fifty-three years, respectively, up to the time of the filing of this suit, in 1905, and claims that it still is so in possession thereof. That during all of such time and up to the time of the filing of the suit, it had paid an annual canon or censo of five per cent of the appraised value thereof to the Spanish authorities, which it claims now easily amounts, with interest added, to more than $50,000, gold; and that it did, shortly after the commencement of this suit, pay an additional censo or canon into the registry of this court for the use of plaintiff, and is now ready and willing to pay those that have accrued since.

The defendant's claim is that it is rightfully in possession of this land, holding the same by an indefeasible censo redimible, or what we would call a "free-farm" or ground-rent title

United States v. St. John's Gas Co.

from the Spanish government, subject only to this annual censo of five per cent of the appraised value thereof, as aforesaid, which runs with the land; and that its right and title are therefore in effect perpetual, and that it has the right to hold the same under such title, and to redeem the censo whenever it shall elect so to do; and that so long as it so pays the censo, it is not subject to ejectment by the United States or any other plaintiff.

On the other hand, the United States claims that the property in question stood registered in the name of the Spanish government at the time of the cession of Porto Rico to the United States, and had been for twelve or thirteen years previously, and that under the treaty of Paris the title thereto passed to the United States, and that therefore the defendant is a mere tenant at will or a licensee, who can be ejected whenever the government needs the property for any purpose.

It was proved at the trial that the government, before filing this suit, through the naval authorities here at San Juan, notified the defendant that it wanted the land for the purpose of storing coal thereon, and that hence it is entitled to the possession.

It would not be profitable to quote and describe in detail all of the numerous and ingenious contentions made by counsel for the respective parties. To even set forth any considerable portion thereof would require much more time and space than we think is necessary, but the following statement of facts may suffice as to the situation.

It unquestionably appears from the evidence that about the time mentioned, 1854 to 1856, the Spanish authorities in Porto Rico caused the plot of land surrounding and including

V. Porto Rico—12.

the tract we are speaking of, to be surveyed, and the square or regular lots to be sold outright at auction. The irregular ones, among which were those in question, were permitted to be sold á censo, on an appraised value. One Gustavo Steinacher bid in the lots in question at the times stated,. and such proceedings were had according to Spanish forms as that the whole "remate" or sale was confirmed and properly archived, but no actual deed was ever delivered to Steinacher, or if it was it has been lost.

About this time, 1853–4,—and this was probably what he desired to secure the land for,—he made a fifteen-year contract with the city of San Juan to build a gas plant on the ground in question, and supply gas therefrom to the city. His contract with the city provided that the whole plant and its appurtenances should become the absolute property of the city after the fifteen years. In 1859, about five years after making this contract with the city of San Juan; Gustavo Steinacher died and left a will which was introduced in evidence, by which he made his only son, Julio E. Steinacher, then just of age, his sole and universal heir, who succeeded to all of his rights in and to the plant in question. In about the year 1874, the contract with the city expired, and Steinacher Junior turned the plant over to the city. The city conducted the plant for a couple of years itself, but failing to make a success of it, gave it back to Steinacher Junior, and the latter continued it for a number of years, until finally an Englishman by the name of Bower came on the scene, and bought out Steinacher's rights, and then had all the latter's rights in the plant conveyed to himself, with a view to organizing a company, which he shortly afterwards did in London, which he capitalized at £30,000, or, at least, it paid that much

for the plant when it was turned over to it. This took place along about 1885; and it seems that when Bower or the defendant undertook to issue bonds, a mortgage had to be placed upon the premises to secure the same. It was then ascertained, as we see it, that under the then, as now, existing mortgage law, there being no title of record anywhere, and a chattel mortgage being unknown to the laws of Spain or Porto Rico, the actual title to the land had to be recorded or inscribed. There was, of course, no title of record, as the land belonged to the Spanish Crown by right of discovery and sovereignty ever since the colonization of the island in 1510 by Ponce de Leon. So it appears that Bower or the defendant had to get the land recorded in the name of the state, so as to make the mortgage given to secure the bonds good. So a most elaborate statement of the situation (plaintiff's exhibit A) was drawn up and recorded to carry out this idea. The English company then proceeded with the plant, and continued running the same until about the year 1900, when its contract with the city expired by limitation, and as the city, then or shortly thereafter, installed an electric system, the plant went into disuse, and has so remained ever since. Through all these years (more than half a century), the annual rent, canon, or censo of five per cent of the original appraised value of this property was paid by every person who held the property; first, by the original Steinacher, next by his son, then by the city of San Juan, and finally by the English company (the defendant), and was so continued up to the bringing of this suit, the last payment, as stated, being made into the registry.

We gather from all the testimony, which is undisputed, that no one ever objected to this arrangement; that all of the prede-

cessors in interest of the present defendant and itself paid this annual censo or ground rent, and the Spanish authorities accepted the same without any question whatsoever, and even at times demanded and sued for it. The first notice the defendant had of any discontinuance of this arrangement was that given by Admiral Dunlap of the American Navy here to the agents of the English company shortly before the bringing of this suit.

There was a large number of exhibits introduced in the way of royal edicts on both sides of the controversy, which it is claimed show that this land, being within the military zone, could be taken away from the defendants at any time without compensation, etc.; but after a careful examination of them all we do not see that that point has been established. We have read the written briefs and arguments from beginning to end on both sides of the case with great care, and cannot see that the transaction between the parties was anything else than as claimed by the defendant; that is, that they have this land in perfect title á censo redimible, which, as we find the law to be, is a perfect title subject to this annual ground rent. It is strenuously argued on the part of the government that a censo redimible always originates in a written instrument. We think that the offer of Steinacher, which was in writing, to accept the offer of the government which was made to the public at the "remates" or sales, forms, in and of itself, a complete contract between the parties, and they acted on it for more than half a century thereafter. It is common knowledge, for which it is not necessary to cite authority, that a grant will be presumed from the government when a defendant has been in adverse possession of land for a long period of time. See United States v. Chaves, 159 U. S. 452, 40 L. ed. 215, 16 Sup. Ct. Rep. 7. This is a New Mex-

United States v. St. John's Gas Co.

ico case, with the facts in which we are quite familiar, and by analogy it has some bearing here. We do not think, though, that we have to indulge any such presumption in this case, for there are written instruments enough in evidence to show an actual contract and agreement. It is our judgment that the Spanish authorities did not even think it necessary to issue a deed, because that would only be necessary when the "redimible" censo was actually redeemed; and the contract between the parties, as set forth in the acceptance and sale and its many confirmations by the Spanish authorities, was sufficient in the meantime. It appeared in evidence that shortly after the time of American occupation, one or two of these yearly sums paid as rent or censo dues were paid to the city of San Juan. That may have been a mistake, and the defendant may, and probably does still, owe these particular payments to the national government, to which they certainly belonged after the treaty of Paris.

It also developed that Congress, on July 1, 1902 (32 Stat. at L. 731, chap. 1383), passed an act wherein it was provided that the President of the United States should make certain reservations of property needed for the purposes of the national government in Porto Rico, and granting the balance of such property in the island to the people of Porto Rico or the insular government. In June, 1903, the President issued two proclamations (33 Stat. at L. 2314, 2315) to carry out the intent of this act, and in and by said proclamations reserved lands for naval purposes, which included the land in controversy. This is also claimed to fix the rights of the government. It will not, of course, be contended that the intention was by this act to violate the treaty of Paris in any manner, or to deprive any person of

title to any property held under the laws of Spain previous to American occupation of the island.

From what we can gather from the evidence, the holders of this property have spent upon it the sum of money paid for censos or rents aforesaid, and in addition, have, from time to time, put buildings thereon that have in all cost anywhere from fifty to eighty thousand dollars, and the buildings thereon at the present time, while in an extremely bad state of preservation, are still worth several thousands of dollars.

We of course admit, as stated in our opinion in La Compañia de los Ferrocarriles v. Rohrer, 4 Porto Rico Fed. Rep. 148, that any title which was good and which could be enforced against the government of Spain immediately before the date of the treaty of Paris is still good and will be enforced after American occupation by our government.

In the first trial of this case, it is our opinion that the then incumbent of the bench, as he himself afterwards confessed, was in error in his holding that an equitable title could never be set up against a legal title in an action of ejectment, because it is our opinion that he ought to have gone further, and held that legal title in ejectment is not always sufficient to enable a plaintiff to recover, because he must, in addition to having the legal title, also be entitled to the possession. This is a case where, in our opinion, our government is not entitled to the possession. It is entitled to collect the rents annually until the defendant desires to redeem the principal, which we figure, judging from the censo paid into court, but not determining that as the proper amount, would be about the sum of $13,256, gold. It also goes without saying that our government can expropriate this land the same as it can expropriate any other land in the island of Porto Rico by proper proceeding in that behalf.

United States v. St. John's Gas Co.

After a most careful examination of all the royal edicts, Spanish laws, expedientes, and other exhibits, as well as the intelligent arguments of counsel, we are of opinion that if the then United States Attorney had made a proper investigation in the insular archives, laborious though it would have been, previous to filing this suit, he would not have been misled by the mere fact of the title being registered in the name of the state, and would probably never have filed the suit. It would, in our opinion, be a most unconscionable act to permit the government of the United States to eject this defendant from this property at this time, after there has been expended thereon such a large amount of money, and when it holds it by what we consider an incontestable title á censo redimible.

We regret that notwithstanding we have given very considerable study to this case, and have looked into the Spanish dictionaries and authorities, particularly Escriche, Alcubilla, and Sanchez Roman, regarding their definitions of censo, censo redimible, censo al quitar, and other sorts of censos, as well as making an examination of the Trevino v. Fernandez Case in 13 Tex. 630–668, besides examining several cases that went from the court of private land claims from New Mexico to the Supreme Court of the United States, still we have not the time to write an opinion such as the importance of the subject warrants. Our regret in this regard, however, is somewhat lessened by the fact that if the cause is appealed, counsel will no doubt repeat before the Supreme Court of the United States their elaborate written arguments, citations, and briefs, which have been so profitable to us in the investigation we have made of the subject.

We are constrained to pass over without comment or notice many points considerably enlarged upon by the respective coun-

sel, and in support of which they cited us to numerous authorities. We do this for the reason that after our extensive investigation it appeared so undeniably true that defendant's contention as to its contract and title is right as that it would not be profitable to pass upon the points. It probably cannot be denied that a censo redimible existing at the date of the treaty of Paris in favor of a defendant remained good thereafter. Neither can we find that such a censo is contrary to any law of the United States applicable in Porto Rico against perpetuities. It is doubtful, even, if such a perpetuity as this is, is repugnant to the law of any state of the Union. It does not appear to be of the kind that is legislated against by the American states, even though such censos are not much in use throughout the nation.

We therefore find as matter of fact that the defendant is in possession of the land in controversy under and by virtue of a censo redimible, as stated, from the Spanish government; and further, we find as matter of law that the United States is not entitled in this proceeding to the possession of the land in controversy, and therefore judgment must be entered for the defendant, and it is so ordered.