# CASES DETERMINED

# SUPREME COURT OF ARKANSAS

## REED v. MONEY.

### Opinion delivered November 2, 1914.

1. TITLE—LONG-CONTINUED POSSESSION—PRESUMPTION—LOST DEEDS.—
Where appellee, and those under whom he claims, have been in
the open, peaceable, continuous and adverse possession of certain
land, for a period of about fifty-seven years, it will be conclusively
presumed that the original holder in appellee's chain of title, ac-
quired a deed to the land from those who had authority to make
it, it not appearing that the latter persons made any other disposi-
tion of the land.

2. LIMITATIONS—INFANCY—CLAIM TO LAND.—The right of an infant
against one who takes possession of its land, accrues at once, and
is barred three years after the infant reaches his majority, in the
absence of any showing of fraud practiced on the infant by the
other party, or those under whom he claims.

3. LIMITATIONS—TACKING OF DISABILITIES.—A female person can not
tack her disability of coverture and nonage, to prevent the bar of
the statute of limitations when, at the time her cause of action
accrued she did not labor under a double disability. Kirby's
Digest, § 5056.

Appeal from Scott Circuit Court; *Geo. S. Evans,*
Special Judge; affirmed.

### STATEMENT BY THE COURT.

This suit was instituted by appellant against the ap-
pellees September 2, 1912, to recover certain lands. Af-
ter describing the lands in her complaint, appellant
alleged that she was the owner of the lands by inheritance
from her father, Isaiah Hickman, who purchased the
land from the United States Government, and who owned
and occupied the land as a homestead at the time of his
death in 1853; that while appellant was very young, she
was taken by force from her mother and sent away to
Texas by William Featherston and Redmon Gaines for
the purpose of keeping her in ignorance of her rights to

her father's estate and with the intent to defraud her out of her property. She alleged, upon information and belief, that her father did not owe any debts at the time of his death, and that he had other lands in addition to the lands in controversy and personal property of the value of $20,000 at the time of his death; that she remained in Texas and married J. L. Reed, her present husband, in 1871, when she was but seventeen years old; that until September, 1910, she did not know of her rights to her father's property, at which time one of her relatives found her and informed her of her father's estate and her ownership of the same. She set up that she was not barred by the statute of limitations because of her coverture, and she prayed for the possession of the land and for damages for the detention of same.

Appellees admitted the purchase of the land in controversy by Hickman from the United States Government, as alleged in the complaint, but denied all other material allegations, and, by way of cross-complaint, set up that Isaiah Hickman, in his lifetime, by warranty deed, conveyed the land and delivered possession of the same to one James F. Gaines about the year 1852; that Gaines, in the year 1853, died seized and possessed of the lands, leaving a will which authorized his executors to sell and convey the same; that the will was probated, and that the deed and will were both placed on record, but same had been lost or destroyed by fire during the Civil war, and if they had been reinstated they were again destroyed by fire in 1882, and that no copy of the deed or will was in existence; that the said executors, while the deed and will were in existence, under the power conferred on them by the will, on the 24th day of November, 1855, sold and delivered possession of all of said lands in controversy to John H. Smith, in consideration of $840, and executed a warranty deed to him for the same on the 5th day of September, 1857; that Smith continued in the open, peaceable and adverse possession of said land from November 24, 1855, until February 27, 1899, when he conveyed the same to Margarette S. Smith, and that she continued

the same adverse holding, under her deed, until her death February 7, 1908, when it descended to her son and only heir, appellee, W. J. Money, who has continued in the adverse possession of the same from the date of his mother's death until the present time; that he and those under whom he held had paid taxes since 1855, and had made valuable improvements. The appellee specifically alleged that they and those under whom they claimed title had been in continuous, open and adverse possession of the lands for a period of fifty-nine years. They alleged that appellant was barred by the statute of limitations.

One I. B. Hickman, on behalf of appellant, testified substantially as follows: That the appellant was the daughter of Isaiah Hickman, and a cousin of witness; that Isaiah Hickman settled on the land in controversy in 1828; that he was not in debt when he died; had a couple of negroes and owned about $20,000 worth of personal property, besides land; that in 1855 there was a sale of the Hickman property on the Hickman place; that appellant lived with her mother until she was about six years old, and then went to live with Uncle Billie Featherston, who was her guardian; that she lived with him until 1862, when she went to live with Redmon Gaines; that in 1863 Redmon Gaines took her to Texas, and witness never saw her any more until September, 1910. Witness knew she had never alienated her land, but did not know where she was. He first ascertained that she had not alienated her land from Doctor Smith, and then from Hall, an abstracter. Witness then examined the record and found that there was no deed from Isaiah Hickman. Witness, having ascertained that appellant had married and moved to Oklahoma, went to see her there in September, 1910. Witness then told her about her father's land, the land in controversy, and that she was entitled to it.

Another witness, Mrs. Anthony, testified that she was 109 years old, and knew Isaiah Hickman and his wife. They had two children, a boy and a girl. The boy died early, and she knew appellant when she was an infant. Appellant and her husband and father-in-law ate dinner

at witness's house just after the war, "when they were here to see about this land." Appellant at that time said she had been to see Doctor Smith about the land.

Appellant, in her own behalf, testified as to her being taken to Redmon Gaines; who took her to Texas in 1863; said she was about nine years old when she went to Redmon Gaines's to live; they treated her as a slave when she was in Texas, and she ran away from Redmon Gaines. She then tells about her wanderings in Texas until she married one J. L. Reed in 1871. Stated that she did not know anything about having any property. She stated that she and her husband came to Arkansas in 1874. She denied, however, that she ate dinner with Mrs. Anthony. Stated that she was in the neighborhood about four days and then returned to Texas.

A witness on behalf of the appellee testified that he was acquainted with the land in controversy about the year 1851; that in the year 1855 Dr. James H. Smith bought the land in question from the executors of the will of James F. Gaines. Doctor Smith and his family moved on the land in 1856 and lived on it and claimed to be the owner of it from that date until about 1882.

Another witness testified that he knew the land since 1856, and that Doctor Smith was living on it at that time. Witness knew that he lived on the place until after the war, and that he made improvements upon the land. This witness testified that the courthouse was burned before February, 1862.

A witness on behalf of the appellee testified that the courthouse of Scott County was burned in 1882. At that time the records were destroyed, except the tax books. The records that were destroyed at that time dated from the year 1860. It was witness's recollection, from hearsay and tradition, that the records had been destroyed before that in 1860.

The testimony of other witnesses tended to show that Doctor Smith had lived on the land before and after the war.

Appellee, W. J. Money, testified that he was acquainted with Dr. James H. Smith, who was his stepfather. Appellee was forty-nine years old. Doctor Smith lived on the land in controversy from the time witness could remember until he moved to Waldron. Appellee's mother owned the land at the time of her death. She, at that time, had possession of the land through her tenants. Appellee went on the place in October, and his mother died the following February. Appellee was the only heir of his mother, and had held the place continuously since her death.

Appellee showed that the taxes had been paid on the lands for forty-five years, and there was a stipulation to the effect that James H. Smith paid the taxes from 1868 to 1902, and Mrs. Smith paid same from 1903 to 1907, and appellee paid them from that time to the time of the bringing of the suit.

There was a stipulation in the record to the effect that there was a deed from Felix G. Gaines and Pamelia F. Gaines, as executors of the last will of James F. Gaines, deceased, executed and acknowledged by them, to James H. Smith September 5, 1857; that this was an ancient and worn document, and had attached to it certificates showing that it had been recorded in Scott County November 17, 1857, and that it was also recorded July 31, 1868. The deed conveys the lands in controversy, with other lands adjoining, and recites that the executors sold the lands to James H. Smith on the 24th day of November, 1855, and that the consideration of $847.50 was fully paid at the time it was due, before the execution of the deed.

Another deed in evidence was from James H. Smith to Margarette S. Smith, conveying the lands in controversy, executed February 27, 1899. The consideration named was natural love and affection and $80 cash in hand. The certificate of record to this deed shows that it was recorded on the 29th of August, 1903.

After the evidence was adduced the court instructed the jury "to return a verdict in favor of the defend-

ants," which was done. Judgment was entered in favor of the appellees, from which this appeal has been duly prosecuted.

*H. N. Smith,* for appellant.

1. The seven years' statute does not run against an infant or *feme covert.* 70 Ark. 371; 67 *Id.* 320. Nor can title by limitation be built up against them. 73 Ark. 221; 47 *Id.* 558; 42 *Id.* 305; 25 Cyc. 1067; 48 Ark. 386.

2. When two or more disabilities are existing the bar does not attach until all are removed. Kirby's Dig., § 5089; 42 Ark. 491; 51 *Id.* 297; 2 Bish., Mar. Wom., § 16; 38 Ark. 278; 62 *Id.* 316; 42 *Id.* 307; 61 *Id.* 527. In this case there never was a time when plaintiff was free from disability. 9 L. R. A. 718; 25 Cyc. 1067; 48 Ark. 386; 42 *Id.* 491.

*A. G. & M. B. Leming,* for appellees.

The claim is barred. Disabilities can not be tacked. Ark. Rep. *passim;* 75 Ark. 593; Kirby's Dig., § 5087; 47 Ark. 301.

WOOD, J., (after stating the facts). 1. The testimony shows that the appellees and those under whom they claim had been in the open, peaceable, continuous and adverse possession of the land in controversy for a period of about fifty-seven years. They had cultivated the lands, paid taxes and made improvements thereon.

In the recent case of *Carter* v. *Goodson et al.,* 114 Ark. 62, this court quoted from *United States* v. *Chaves,* 159 U. S. 452, in part, as follows: "If the adverse claim could have a legal commencement, juries are advised or instructed to presume such commencement, after many years of uninterrupted possession or enjoyment. Accordingly, royal grants have been thus found by the jury, after an indefinitely long continued peaceful enjoyment." And also from *Fletcher* v. *Fuller,* 120 U. S. 534, as follows: "When possession and use are long continued they create a presumption of lawful origin; that is, that they are founded upon such instruments and proceed-

ings as in law would pass the right to the possession and
use of the property."

Judge HART, speaking for the court, in *Carter* v.
*Goodson, supra*, said: "When we consider the further
fact that the land has been in the possession of Eppy
White and his grantees ever since the year 1857, and
that these parties have cleared the land, made improve-
ments on it, cultivated it and paid taxes on it, we think
the circuit court was justified in finding that a grant had
been made to Eppy White."

(1) So under the facts disclosed by the present rec-
ord, it will be conclusively presumed that Dr. James H.
Smith, under whom appellees claim, acquired his deed
from those who had authority to make it. While there
is no record of a deed from Isaiah Hickman, appellant's
ancestor, to James F. Gaines, through whom the appel-
lees claim by virtue of a deed from his executors to James
H. Smith, and through mesne conveyances to appellee,
W. J. Money, yet after this lapse of time and the continu-
ous possession and exercise of ownership over the lands
by appellees and those through whom they claim, a pre-
sumption of a grant from Hickman, the original owner,
to James F. Gaines will arise, and likewise authority in
the executors of Gaines to execute the deed to Dr. James
H. Smith, through whom appellees claim. The deed to
Doctor Smith from the executors of Gaines was fifty-five
years old. The testimony shows that the deed records
of Scott County, recording that which would have taken
place during the lifetime of Hickman and Gaines, had
been destroyed by fire. After the death of these parties
and the destruction by fire of the record of conveyances
that were made in those times, the law will presume
that Hickman conveyed the property in controversy to
Gaines, and that the executors of Gaines were duly au-
thorized to execute the deed to Dr. James H. Smith,
through whom appellees claim title. The law will pre-
sume from the deed to Doctor Smith, which was fifty-
five years old at the time this suit was brought, and the
continuous possession thereunder, that the title was

properly vested in him by those under whose deed he claimed title and went into possession.

(2) Moreover, appellant is barred by the statute of limitations. Appellant was three years old at the time that Doctor Smith went into the adverse possession of the land under his deed. Her right accrued as soon as Doctor Smith took possession under his deed. While appellant was not barred, on account of nonage, until three years after she reached her majority, she was barred after that time. There is nothing to warrant a finding that appellant was kept in ignorance of her rights through any fraud or deception practiced on her by the appellees or those under whom they claim. Appellant could have brought her suit at any time before 1874; after that time she was barred. Kirby's Digest, § 5056.

(3) Appellant contends that her marriage to Reed in 1871, before she reached her majority, prevented the bar of the statute of limitations on account of nonage attaching. But appellant can not tack her disability of coverture and nonage in order to prevent the bar of the statute, for at the time her alleged cause of action accrued she did not labor under a double disability. She was an infant at that time, but she was not also a married woman. No cumulative disability shall prevent the bar of the statute of limitations. Last clause of section 5056, *supra.*

A married woman can not tack her coverture to her infancy to avoid the statute of limitations. *Millington* v. *Hill, Fontaine & Co.,* 47 Ark. 301.

In *Stull* v. *Harris,* 51 Ark. 297, Chief Justice COCKRILL, speaking for the court, said: "It is the statutory rule of this State that when there are two coexisting disabilities when the action accrued, the party is not bound to act until the last is removed." Appellant cites this and other cases in which the court held that where a party labors under the double disability of infancy and coverture at the time the cause of action accrued such party is not bound to act until the last disability is removed, but those cases have no application here, for the

reason that appellant was not laboring under a double disability of infancy and coverture at the time her cause of action accrued.

The judgment is correct. Affirmed.